# Wytheville.

## GEOGHEGAN SONS & COMPANY, INC., v. ARBUCKLE BROTHERS.

### June 12, 1924.

1. CONTRACTS—*Construction—Whether Construction for Court or Jury—Unambiguous Contract—Several Papers.*—Where a written contract is clear and unambiguous on its face, it is the duty of the court to construe it, whether the contract be contained in a single document or evidenced by several papers. Where the contract is not clear and unambiguous on its face, but is rendered so by extraneous evidence which has been properly admitted, so that nothing remains to be done except to construe the contract in the light of such extraneous evidence, it is equally the duty of the court and not of the jury to construe it.

2. CONTRACTS—*Construction—Whether for Court or Jury—Ambiguous Contract.*—But where the language of the contract is not clear and unambiguous, and resort to extrinsic evidence is necessary, if the situation is such that fair minded men might reasonably draw different conclusions therefrom, then the construction of the contract is for the jury, under proper instructions from the court, even though the evidence be not conflicting.

3. CONTRACTS—*Construction—Whether for Court or Jury—Conflicting Extrinsic Evidence.*—In many, and probably most, cases where the language of the contract is not clear and unambiguous, and resort to extrinsic evidence is necessary, the extraneous testimony is conflicting, and this at once renders the case one proper for the decision of a jury. But it is not necessary that the evidence should be conflicting in order to refer the construction to the jury; it is sufficient if, when all the evidence is in, both written and oral, fair minded men might reasonably arrive at a different conclusion.

4. SALES—*F. O. B.—Construction.*—In the instant case, an action for the purchase price of sugar, defendant contended that there was no sale f. o. b. New York. The initial proposal for the sale of the sugar was "at twenty-one cents New York." This proposal was accepted "as per your letter." The invoice of the sugar, dated August 10, 1920,

the receipt of which the defendant acknowledged, contained the words, "freight f. o. b. New York;" and at the trial a witness was permitted to testify without objection that "twenty-one cents New York" meant f. o. b. New York.

*Held:* That there could be no doubt that the sale, if there was a completed sale, was f. o. b. New York.

5. SALES—*F. O. B.—Meaning of F. O. B.—Title.*—A sale f. o. b. cars means that the subject of the sale is to be placed on the cars for shipment without any expense or act on the part of the buyer, and that as soon as so placed the title is to pass absolutely to the buyer and the property be wholly at his risk, in the absence of any circumstances indicating a retention of control by the seller as security for purchase money, by preserving the right of stoppage *in transitu.*

6. SALES—*Construction of Sale Contract—Pool Car Shipment.*—In the instant case, an action for the purchase price of sugar, defendant contended that the contract of sale did not authorize the plaintiffs to ship the sugar through to Richmond in a carload lot with other shipments of sugar to be distributed at Richmond to several vendees. The pool car arrangement, if not expressly authorized, was acquiesced in and ratified by the defendant. In fact, it was first suggested by the defendant in a letter ordering the sugar, in which he said: "This may come through to Richmond in a car lot," and there were other uncontradicted circumstances which made it plain that fair minded men could not reasonably come to any other conclusion than that the sale was for the sugar at twenty-one cents per pound f. o. b. New York, to be shipped in a car with other sugars consigned to a wholesale merchant in Richmond.

7. CARRIERS—*Sales—Delivery—What Constitutes Delivery.*—To constitute a delivery to a common carrier by a vendor the carrier must have accepted the goods in his capacity as carrier, and assumed exclusive custody and control over them, and the consignor must at the same time have parted with and entirely surrendered his possession and control over the same.

8. CONTRACTS—*Construction—Acquiescence of One Party to Construction Placed on the Contract by the Other.*—Where the construction placed upon a contract by one of the parties to it, if not by both of the parties, is acquiesced in by the other party at the time of the contract and for some time afterwards, the party so acquiescing is concluded by such acquiescence.

9. SALES—*Delivery—Delivery to Carrier.*—Where no question is raised as to the solvency or pecuniary responsibility of the carrier to whom delivery is made, generally a delivery to a responsible carrier is sufficient in the absence of directions from the buyer, and such a delivery on a sale f. o. b. at the place of shipment is a delivery to the buyer.

10. SALES—*Delivery—Place of Delivery.*—Where nothing is said about the place of delivery in the bargain, it is taken for granted that the goods are to be at the buyer's disposal at the place where they are when sold. Thus, where sugar is purchased from a refiner and the place of delivery is not fixed by the contract, the place of delivery is the seller's refinery.

11. SALES—*Place of Delivery—Admissibility of Parol Evidence—Quaere.*—Whether or not parol evidence is admissible to.show a different place of delivery from the place where the goods were at the time of sale, when no place is stated in the contract, is a question upon which the authorities are in conflict. In the instant case, however, it was unnecessary to pass on the question, as the place of delivery was fixed by the contract.

12. SALES—*Place of Delivery—General Rule.*—Whether it is for the buyer to take possession of the goods or for the seller to send them to the buyer is a question depending in each case on a contract express or implied between the parties. Apart from any such contract, express or implied, or usage of trade to the contrary, the place of delivery is the seller's place of business if he have one, and if not his residence, but in case of a contract to sell, or a sale of specific goods, which to the knowledge of the parties when the contract or the sale was made were in some other place, then that place is the place of delivery.

13. SALES—*Delivery—When Title Passes—Subject Matter in Bulk—Sale of a Certain Part—Separation.*—While the sale of a specific chattel may pass the property to the buyer, although no delivery is made, where the subject matter of the sale is in bulk, and a certain quantity is sold, to be taken from a greater quantity, no title passes until separation is made. But the bulk or greater quantity referred to must manifestly be the bulk in the possession and ownership of the seller. When the seller has separated the goods sold from those retained by him, there can be no good reason why several purchases may not, at the request or with the consent of the buyers, be shipped to them in a single car.

14. SALES—*When Title Passes—Separation from Mass.*—Where goods are of the same kind or quality, and no selection is required, but only separation from the general mass, title to a part of the mass may pass, if the parties so intend, without awaiting actual separation.

15. SALES—*When Title Passes—Bags of Sugar Shipped by Seller in Car with Other Bags for Other Purchasers—Case at Bar.*—In the instant case, plaintiffs were refiners of sugar, and defendant was a wholesale grocer. Defendant purchased from plaintiffs 110 bags of sugar and these bags were shipped in a carload lot to a wholesale grocer in Richmond by plaintiffs, together with other bags of sugar for other purchasers from plaintiffs, there to be distributed to the several purchasers. Defendant contended that there was no perfected sale

to him of the bags of sugar and that the delivery to the carrier did not pass title to defendant.

*Held:*  That the bags of sugar were separate units, each of the same quantity, quality, and value, and the delivery of the 110 bags to the carrier passed title to the defendant, even though other like units were delivered to the same carrier to be shipped in the car to other buyers.

16.  SALES—*Definition—Executed Sale—Executory Sale—Loss Follows the Title.*—A sale may be defined as the transfer of the title of a chattel from seller to buyer by a contract whose consideration is a price in money.  By this definition is intended an executed sale where the agreement is both contract and conveyance, and the title passes to the buyer; but there may also be an executory sale, *i. e.*, an agreement for a sale which is contract only, and not a conveyance, leaving the title as yet in the seller.  The executed sale must be carefully distinguished from the executory, for whether the title has as yet passed becomes a question of the utmost importance when the chattel perishes, the doctrine being that "loss follows the title," "*Res perit domino.*"

17.  SALES—*When Title Passes—Loss Follows the Title.*—Although the general rule is that loss follows the title, there are cases where the risk of loss follows the possession of the buyer, although the title remains in the seller.  This is dependent upon the intention of the parties, which may be express or implied.  The most notable instance of a severance of title and liability for loss is that of a conditional sale, though there are other instances.

Error to a judgment of the Circuit Court of Mecklenburg county, in a proceeding by motion for a judgment for money.  Judgment for plaintiffs.  Defendant assigns error.

*Affirmed.*

The opinion states the case.

*Irby Turnbull,* for the plaintiff in error.

*McGuire, Riely & Eggleston, Faulkner & Faulkner,* and *Aubrey R. Bowles, Jr.,* for the defendant in error.

BURKS, J., delivered the opinion of the court.

This was an action by Arbuckle Brothers, plaintiffs, against the defendant to recover the purchase price of 110 bags of sugar sold to the defendant, for which it refused to pay.

In the summer of 1920, sugar was scarce and high, and the difficulty in getting transportation was great. So great was this difficulty that the plaintiff would not ship in less than carloads, with a minimum of 60,000 pounds, and "all of these parties were aware of the practice of shipping sugar to Richmond in car lots." Such were the conditions when the contract in suit was entered into.

The contract was entirely by correspondence. It was negotiated through F. V. Gunn & Company, brokers, of the city of Richmond. It began by a letter from the brokers to the defendants, dated July 24, 1920, saying: "We remember that you have frequently asked us regarding sugar. We have an opportunity now to sell you sugar and it is the first opportunity we have had since our business acquaintance with you. Messrs. Arbuckle Brothers are offering at twenty-one cents, New York, for shipment up to August 10th." On the same date, the defendant replied, saying: "Please ship, as per your letter, 100 sacks granulated sugar 100s, 10 sacks yellow sugar. This may come through to Richmond in a car lot and we will appreciate it if you will rush this out to us." The brokers had some difficulty in getting the order accepted. But on August 6, 1920, they wired the defendant: "Entered your 100 bags fine, ten bags eights twenty-one," and on the same date wrote the defendant confirming their telegram "on a basis of twenty-one cents, New York," and saying further: "The sugar will be shipped promptly in a pool car to a wholesale grocer in Richmond, and on arrival we will reship the same to you. Of course, you are to pay us the handling and cartage charges, which will be probably one cent per bag for handling, and at the prevailing cartage charge which we think we could get

done for five cents per hundred, or $1.00 for a ton."
On August 10, the 110 bags of sugar for the defendant,
twenty-five barrels for Fleming & Christian, together
with 400 bags for E. W. Gates & Son Company, in all
respects similar to the 110 bags, were delivered to the
carrier, and consigned to E. W. Gates & Son Company,
wholesale grocers, Richmond, Va. Through some un-
explained delay on the part of the carrier, the car did
not reach Richmond until September 17, 1920. On
the same date the 110 bags were tagged and reshipped
to the defendant at Chase City, Virginia, and was
received there the next day, September 18. An in-
voice of the 110 bags dated August 10, 1920, was
sent by the plaintiffs to the defendant in which it is
stated, "Freight f. o. b. New York." It does not
appear when the invoice was received by the defend-
ant, but on September 3, 1920, the defendant wrote
the plaintiff: "We have yours of 1st September and
beg to advise that your sugar invoice of August 10th
has not been overlooked, but check will be sent you
upon arrival of sugar or properly signed bill of lading."
In the meantime, on August 25, 1920, the defendant
wrote to the brokers, F. V. Gunn & Company, Rich-
mond, complaining of delay in receiving the sugar,
and saying: "This delay has caused us a loss of
$3.90 per 100 pounds or $429.00 on our 110 sacks and
it occurs to the writer that the railroad company is *on*
can be held responsible." On September 14, 1920,
defendant wrote to F. V. Gunn & Company, saying:
"We cannot now use this sugar unless we are given
the present price on same." On September 18, 1920,
the day the sugar arrived at Chase City, the defend-
ant wrote F. V. Gunn & Company as follows:

"We are surprised that you have shipped us 110
sacks of sugar which came to Richmond, Va., in a car

4

that has been on the railroad for more than a month and not inform us as to how we stand on a claim. We are powerless to protect ourselves except to decline accept the sugar as written you several times before—therefore until we are assured of protection, this sugar will remain in the depot. We bought this sugar about the first of July for immediate shipment and this is the 18th of September and a most unreasonable time has elapsed since that time.

"On this schedule, we might buy an article now for quick shipment and get it about the year 1925.

"We will await your advice in the matter.

"If the sugar had been shipped direct to us we could have protected ourselves without any assistance from anyone else, but as we did not purchase this to be shipped with another and knew nothing of a pool car until some weeks later, we cannot accept the sugar unless we are protected.

"If you so desire we will accept this sugar from the freight station and store it until adjustment can be made."

In reply to this letter, F. V. Gunn & Company, under date of September 20, 1920, amongst other things, wrote: "It is unfortunate that you have sustained a loss, however, these things cannot be foreseen. The car was consigned to Messrs. E. W. Gates Sons Company, who are, of course, interested if they have a claim against the railroad company, and if they have, they will enter claim in which event your 110 bags will be included."

When the sugar arrived at Chase City on September 18, 1920, it was not taken out of the depot immediately. On September 24, 1920, the defendant wrote the plaintiffs, saying, amongst other things: "In order to save

you any storage charges on the 110 sacks sugar we are going to take it out of the depot today and expect you to protect us as we cannot protect ourselves on account of the way you shipped it out from New York in a pool car.   *   *   *   If this is not satisfactory we will hold the sugar subject to your instructions." This action of the defendant in taking the sugar out of the depot to save storage charges was not previously authorized nor subsequently ratified by the plaintiffs. The defendant paid the freight to Richmond, and the charges for cartage and handling there and also the freight from Richmond to Chase City.

There is now pending an action by E. W. Gates & Son Company against the carrier for damages caused by the delay, in which action the claim of the defendant for his losses occasioned by such delay is included.

There was a verdict and judgment for the plaintiffs for the full amount of their claim, to-wit, $2,305.00, with interest and costs.

There are four assignments of error to the ruling of the trial court in granting and refusing instructions, and one for refusing to set aside the verdict of the jury as contrary to the law and the evidence, and for misdirection.

Counsel for the plaintiff in error (defendant below) developed practically his whole case in the discussion of his objection to instruction No. 1, given for the plaintiffs, which instruction was as follows:

"The court instructs the jury that the contract covering the sale of sugar involved in this case is embraced in the letters and telegrams shown in evidence that passed between the plaintiffs and the defendant through F. V. Gunn & Company; that said letters and telegrams show that said sale was f. o. b. New York city; and that in said contract the defendant authorized the

plaintiffs to ship said sugar through to Richmond in a car lot; and if the jury believe from the evidence that the plaintiffs, within a reasonable time after the order for said sugar was received by them, delivered said sugar to the railroad company in New York city in a car lot with other sugar consigned to E. W. Gates & Son Company, Inc., at Richmond, Va., and at the same time mailed an invoice for said sugar to the defendant, showing shipment in such manner, then the plaintiffs complied with their contract as to the delivery of said sugar and upon such delivery to said railroad company in New York said sugar became the property of the defendant and the plaintiffs are not responsible for any delay thereafter occurring while said sugar was in the hands of said railroad company or its connecting lines."

The first objection to the instruction is that the court construed the contract between the parties, whereas, under the circumstances, the construction of the contract should have been left to the jury under proper instructions from the court.

[1, 2] Where a written contract is clear and unambiguous on its face it is the duty of the court to construe it, whether the contract be contained in a single document or evidenced by several papers. Where the contract is not clear and unambiguous on its face, but is rendered so by extraneous evidence which has been properly admitted, so that nothing remains to be done except to construe the contract in the light of such extraneous evidence, it is equally the duty of the court and not of the jury to construe it. *Licking Rolling Mill Co.* v. *Snyder & Co.*, 28 Ky. L. Rep. 357, 89 S. W. 249. But where the language of the contract is not clear and unambiguous, and resort to extrinsic evidence is necessary, if the situation is such that fairminded men might reasonably draw different conclusions there-

from, then the construction of the contract is for the jury under proper instructions from the court, even though the evidence be not conflicting. *Railroad Co.* v. *Stout,* 17 Wall. 657, 664, 21 L. Ed. 745; 23 Am. & Eng. Ency. L. (2d ed.) 565.

The rule is well stated by Judge Kelly in *Rickard* v. *Rickard,* 134 Va. 485, 494, 115 S. E. 369; citing numerous cases, as follows: "As a general rule it is the duty of the court and not of the jury to construe written instruments. *Burk* v. *Lee,* 76 Va. 386, 388. Where, however, the true meaning of the terms of the instruments depends upon parol testimony as to the effect of which there may be difference of opinion, the question is one for the jury, upon proper instructions, to decide. *Camp* v. *Wilson,* 97 Va. 265, 270, 33 S. W. 591; *Straus* v. *Richmond, etc., Co.,* 109 Va. 724, 729-730, 65 S. E. 659, 132 Am. St. Rep. 937; *Walker* v. *Gateway Milling Co.,* 121 Va. 217, 227, 92 S. E. 826; *Ewell* v. *Brock,* 120 Va. 475, 478, 91 S. E. 761; *Warner* v. *Miltenberger,* 21 Md. 264, 83 Am. Dec. 573."

[3] It is true that in many, probably most instances, the extraneous testimony is conflicting, and this at once renders the case one proper for the decision of a jury. Such was the fact in *Camp* v. *Wilson,* 97 Va. 265, 33 S. E. 591; *Strause* v. *Richmond, etc., Co.,* 109 Va. 724, 65 S. E. 659, 132 Am. St. Rep. 937; *Walker* v. *Gateway M. Co.,* 121 Va. 217, 92 S. E. 826; and *Turner* v. *Hall,* 128 Va. 247, 104 S. E. 861. But it is not necessary that the evidence should be conflicting in order to refer the construction to the jury, it is sufficient if, when all the evidence is in, both written and oral, fairminded men might reasonably arrive at different conclusions. 23 Am. & Eng. Ency. L. (2d ed.) 565.

[4-6] It is further insisted by counsel for the plaintiff in error, that, even if it was proper for the court to con-

strue the contract, it put the wrong construction on it; that there was no sale f. o. b. New York; and that the contract did not authorize the plaintiffs to ship the sugar through to Richmond in a carload lot.

The initial proposal for the sale of the sugar was "at twenty-one cents New York." This proposal was accepted "as per your letter." The invoice of the sugar dated August 10, 1920, the receipt of which the defendant acknowledged, contained the words, "freight f. o. b. New York," and at the trial a witness for the plaintiffs was asked: "What does that twenty-one cents New York mean?" and was permitted to answer without objection from the defendant. His answer was, "f. o. b. New York. All sugars are sold f. o. b. the refining point; that is, the sugars that the brokers sell for the refineries." Upon this evidence uncontradicted, and received without objection, there can be no doubt that the sale, if there was a completed sale, was f. o. b. New York. The meaning of that term is thus defined in *Lawson* v. *Hobbs*, 120 Va. 690, 693, 91 S. E. 750:

"A sale f. o. b. cars means that the subject of the sale is to be placed on the cars for shipment without any expense or act on the part of the buyer, and that as soon as so placed the title is to pass absolutely to the buyer and the property be wholly at his risk, in the absence of any circumstances indicating a retention of such control by the seller as security for purchase money, by preserving the right of stoppage *in transitu.*"

The pool car arrangement, if not expressly authorized, was acquiesced in and ratified by the defendant. In fact, it was first suggested by the defendant. In its letter of July 24, 1920, ordering 110 bags of sugar at twenty-one cents New York, it was said: "This may come through to Richmond in a car lot, and we will appreciate it if you will rush this out to us." On August

6, 1920, four days before the shipment was made, Gunn & Company wrote the defendant: "The sugar will be shipped promptly in a pool car to a wholesale grocer in Richmond, and on arrival we will reship the same to you. Of course, you are to pay us the handling and cartage charges, which will be probably one cent per bag for handling, and at the prevailing cartage charge which we think we could get done for five cents per hundred or $1.00 for a ton." . The invoice sent to the defendant states that the sugar was "consigned to E. W. Gates & Son Company, Richmond, Va.," a firm of wholesale grocers, known to and trusted by the president of the defendant company. The receipt of the invoice was acknowledged by the defendant to Gunn & Company in a letter dated August 25, 1920, and on September 3, 1920, the defendant wrote the plaintiffs: "We have yours of 1st September and beg to advise that your sugar invoice of August 10th has not been overlooked, but check will be sent you upon arrival of sugar or properly signed bill of lading." On August 25, 1920, the defendant wrote Gunn & Company: "We will thank you to see Messrs. E. W. Gates & Company and it's possible that they can make the railroad company reimburse us for our loss by the decline.

"At any rate whatever that firm will do will be governed accordingly, as the writer knows Mr. Hiram Gates well and believes he will do what can be done to protect both of us."

It is not denied that suit is now pending against the railroad company to recover damages for the delay, and that defendant's claim is asserted therein. No objection was made to the "pool car" shipment until about September 16, 1920, a few days before the arrival of the sugar at Chase City. Moreover, in the petition for the writ of error it is said: "From the time the order was

received the plaintiffs knew that their usual practice of shipping in car lots would be observed, and they made arrangements with Gunn to redistribute the sugar at Richmond, and before the sugar was shipped, on August 6, 1920, Gunn wrote the defendant that the sugar would be shipped from New York to Richmond, to a wholesale grocer, and that Gunn would reship it to defendant. And it was so handled." Under these circumstances, we are of opinion that whatever ambiguity, if any there was, in the writings constituting the contract, is made plain by the extraneous evidence hereinbefore recited, which is uncontradicted; that fair-minded men could not reasonably come to any other conclusion than that the sale was for the sugar at twenty-one cents per pound f. o. b. New York, to be shipped in a car with other sugars consigned to E. W. Gates & Son Company, and that the trial court committed no error in this respect in said instruction No. 1.

[7] In 24 Am. & Eng. Ency. L. (2d ed.) 1058, it is said: "To constitute a delivery to a common carrier in this connection the carrier must have accepted the goods in his capacity as carrier, and assumed exclusive custody and control over them, and the consignor must at the same time have parted with and entirely surrendered his possession and control over the same."

All of these conditions were fully met and complied with in the instant case.

[8] We are further of opinion that this construction was placed upon the contract by the plaintiffs, at least, if not by both parties; that it was acquiesced in by the defendant, at the time the shipment was made and for some time thereafter, and that the defendant is concluded by such acquiescence. *Kidwell* v. *Balto. & O. R. Co.,* 11 Gratt. (52 Va.) 676.

[9, 10] No question has been raised, nor could there

be, as to the solvency or pecuniary responsibility of the carrier to whom delivery was made, and generally a delivery to a responsible carrier is sufficient in the absence of directions from the buyer.   Such a delivery on a sale f. o. b. at the place of shipment is a delivery to the buyer.   *Lawson* v. *Hobbs, supra;* Benj. on Sales, sec. 693; 24 Am. & Eng. Ency. L. (2d ed.) 1971.

It is said in the petition for the writ of error: "It was our contention that the place of delivery was omitted from the terms of the contract, and that therefore it was a question for the jury, to be gathered from all the facts and circumstances of the case."   There was no dispute about the facts, and, as we have seen, the place of delivery was fixed by the contract at New York, but if the place of delivery had not been so fixed, the general rule as to goods of this character is, that the place of delivery was the plaintiff's refinery.

In Benj. on Sales, sec. 682, it is said:   "As to the *place* where delivery is to be made, when nothing is said about it in the bargain, it seems to be taken for granted almost universally, that the goods are to be at the buyer's disposal, at the place where they are when sold."   To the same effect, see 2 Kent's Com. (12th ed.), p. 505; 24 Am. & Eng. Ency. L. (2d ed.) 1069, and 23 R. C. L., p. 1376, sec. 199, noting certain exceptions not necessary to be noticed.

[11] Whether or not parol evidence is admissible to show a different place of delivery from the place where the goods were at the time of the sale, when no place is stated in the contract, is a question upon which the authorities are in conflict.   2 Williston on Contracts, sec. 640.

In *La Farge* v. *Rickert*, 5 Wend. (N. Y.) 187, 21 Am. Dec. 209, no place of delivery of portable articles was specified in the contract, and it was held that, by con-

struction of law, the residence of the seller was the place of delivery, and that parol evidence was not admissible to prove a contemporaneous agreement fixing a different place of delivery. The court said: "The written contract of the parties, therefore, according to the established. rules of construction, having settled other rights and duties as to the place at which these articles were to be delivered, it was improper to admit parol evidence of their declarations before or at the time of the giving of the receipt, to show that a different place had been agreed upon. The written contract was the only legal evidence as to the intentions of the parties up to the time it was executed. All previous arrangements were merged in that. A written contract cannot be varied by parol, and where the legal construction and effect of an instrument are well settled, it is varying the instrument to show that the parties intended something else, as much as it would be to prove that the terms used were not in accordance with the previous agreement." This holding is quoted with approval in *Woodward* v. *Foster*, 18 Gratt. (59 Va.), at p. 212. But see what is said in *Lawson* v. *Hobbs*, 120 Va., at p. 695, 91 S. E. 750. It is unnecessary to pass on the question in the instant case, as the place was fixed by the contract, and we express no opinion on the subject. But see *Elbert* v. *Arends*, 190 Ill. 221, 60 N. E. 211; *La Farge* v. *Rickerts, supra; State* v. *Kenosha Home T. Co.*, 158 Wis. 371, 148 N. W. 877; Ann. Cas. 1916-E, 365; *Delaware* v. *Oregon Iron Co.*, 14 Wall. 579, 20 L. Ed. 779.

[12] In the uniform sales act, which, however, has not been adopted in this State, it is enacted: "Whether it is for the buyer to take possession of the goods or for the seller to send them to the buyer is a question depending in each case on a contract, express or implied, between the parties. Apart from any such contract, express or

implied, or usage of trade to the contrary, the place of delivery is the seller's place of business, if he have one, and if not, his residence, but in case of a contract to sell, or a sale of specific goods, which, to the knowledge of the parties when the contract or the sale was made, were in some other place, then that place is the place of delivery." 2 Williston on Contracts, sec. 956. This is believed to be merely declaratory of the existing law.

The plaintiffs were refiners of sugar. The defendant was a wholesale grocer. It is earnestly insisted that, upon the evidence hereinbefore stated, there was no perfected sale of the 110 bags of sugar to the defendant, and that the delivery of them to the carrier did not pass title thereto to the defendant; that there was no such separation and appropriation of these 110 bags to the contract as was necessary to constitute a sale.

[13] Undoubtedly, the general rule, supported by a great array of authority, is as stated in 24 R. C. L., sec. 286: "While the sale of the specific chattel may pass the property to the buyer, although no delivery is made, the doctrine established by all the elementary writers on the subject and by the authorities in England and in most jurisdictions in this country, is that where the subject matter of sale is in bulk, and a certain quantity is sold, to be taken from a greater quantity, no title passes until the separation is made."

But the bulk or greater quantity referred to in the foregoing quotation is manifestly the bulk in the possession and ownership of the seller. When the seller has separated the goods sold from those retained by him, there can be no good reason why several purchases may not, at the request, or with the consent of the buyers, be shipped to them in a single car. It violates no rule of law, and may be greatly to the advantage of the buyers. In the instant case, it appears from the testimony that

shipments could not be obtained at all except in car lots, and the freight was less.   The price per bag was fixed, the bags contained each 100 pounds, and the contents of each bag was in every respect identical in quality.   The defendant suggested and consented to the shipment in a car lot, made no request for identification marks, and would not have been benefited if they had been placed on each bag.   The real ground of complaint is not damage from the manner of the shipment, but the loss entailed by the delay in the receipt of the sugar.   This would not have been affected if every bag had borne the name of the purchaser.

[14] We might, perhaps, safely rest our conclusions here, but the general rule above stated is not of universal application.   It has been held in Virginia, New York, Connecticut, Kansas, and other States, that where goods are of the same kind or quality, and no selection is required, but only separation from the general mass, title to a part of the mass may pass, if the parties so intend, without awaiting actual separation.   *Pleasants* v. *Pendleton*, 6 Rand. (27 Va.) 473, 18 Am. Dec. 726; *Kimberly* v. *Patchin*, 19 N. Y. 330, 75 Am. Dec. 334; *Chapman* v. *Sheppard*, 39 Conn. 413; *Kingham* v. *Holmquist*, 36 Kan. 735, 14 Pac. 168, 59 Am. Rep. 604; 24 R. C. L., p. 26, sec. 287, and cases cited in note 2.

*Pleasants* v. *Pendleton, supra,* was decided by a court of three very able judges, and each of them delivered a separate opinion.   There was no dispute as to the facts of that case, which are briefly stated by counsel for the defendants in error (plaintiffs below) substantially as follows: Pendleton sold to Pleasants 119 barrels of flour with certain mill brands on them.   The price per barrel of each brand was uniform.   The barrels were situated in the warehouse of a third party.   The buyer received an order on the warehouseman for the number of bar-

rels purchased.   There were in the warehouse many other barrels of flour, of various other brands, belonging to the seller and other parties.   Of the brands sold to Pleasants, there were, besides the barrels embraced in the purchase, two barrels each, of two brands, included in the order, these four additional barrels belonging to the seller.   Before the buyer's barrels were separated from these other barrels belonging to the seller and from the general mass of barrels in the warehouse, the building took fire and all the barrels were burned.   The seller brought *assumpsit* for the purchase price and recovered. The judgment was affirmed on appeal.   No question was raised about the right or power to make a constructive delivery of the flour by an order on the warehouseman, but it was insisted "that there can be no constructive delivery, where anything remains to be done, as between the vendor and vendee, to put the property in a deliverable condition."   The price was fixed at $3.50 per barrel, and the barrels of flour were of uniform weight and quality.   Nothing remained to be done except to count the barrels, or eliminate the four barrels not sold.

It is not practicable to quote from each of the opinions, and we must content ourselves with the following from the opinion of Judge Cabell:   "In cases like these, where portions of a larger mass, liquid or solid, are sold, and where the portion sold must be *weighed* or *measured* (which of necessity includes the idea of *separating* them from the general mass), it may be said that the identity and individuality of the part sold must be ascertained by actual separation from its kindred residue, before the sale will be complete to pass the property; or, in other words, before there can be a constructive delivery.   But it by no means follows that the same principle applies to cases where the things sold are not portions of a

larger mass, to be separated by weighing or measuring; but consist of divers separate and individual things, all precisely of the same kind and value, mixed with divers other separate and individual things, which are also of the same kind and value, and between which and the things sold there is no manner of difference whatever. There is no case of this kind to which the principle has been applied. On the contrary, it has been decided, that in such cases no actual separation is necessary, even to support the action of trover. * * * It is further contended for the appellant, that it was necessary to *count* the barrels before they could be delivered, and that the sale could not be complete to pass the property, until they were counted. But, I have not found any adjudication which countenances the idea, that the necessity to *count* the things sold will produce that effect, in cases where the things sold are individual things, of the same value with each other, and with those with which they are mixed, and where the counting is not necessary for ascertaining the amount of the purchase money. In the case before us, the things sold were individual things, of the same value, so far at least as relates to the flour of the same brand; and no counting was necessary for ascertaining the amount of the purchase money; that was fixed by the terms of the contract itself. The barrels, it is true, were to be counted. But so they must be in cases where a certain number is sold, at an agreed price, and where there are no more in the warehouse than the number sold. But, in such cases they are counted, merely to see that they *are in the warehouse*. And it would not be contended, I presume, that the necessity for counting, in such cases, would prevent the property from passing. I admit, that if the sale had not specified the number of barrels, but had been of all the flour in the warehouse, or of all the flour

of any particular brand, at so much per barrel, such a sale would not pass the property, until the barrels were *counted;* because, the *counting* would be necessary in that case for ascertaining *the amount of the purchase money;* and no sale can be complete until that is ascertained."

The opinion, after distinguishing other English cases, relies for support on *Jackson* v. *Anderson*, 4 Taunt. 24, where a sale of 1,969 Spanish milled dollars out of a barrel containing 4,718 of such dollars, not separated, was upheld by Chief Justice Mansfield.

[15] In the instant case, the bags of sugar were separate units, each of the same quantity, quality and value, and the delivery of the 110 bags to the carrier passed title to the defendant, even though other like units were delivered to the same carrier to be shipped in the same car to another buyer.

[16] The case of *Ellis & Meyers Lumber Co.* v. *Hubbard*, 123 Va. 481, 96 S. E. 754, cited and relied on by counsel for the plaintiff in error (defendant below), in no way conflicts with the view herein expressed. There the contract was for lumber to be manufactured, and the contract specified when the title was to pass, with a condition subsequent annexed as to inspection, measuring, etc. In the portion of the opinion quoted and relied on, Judge Sims was drawing the distinction between an executory contract for the sale of lumber and an actual bargain and sale. It was only as to a contract *of* sale, or as usually expressed a bargain and sale, that it was said that the subject of the contract must be specific. No one ever doubted the validity of an executory contract for the sale of lumber to be manufactured. When the lumber was subsequently manufactured, and set apart and delivered on the leased premises, according to the terms of the contract, that constituted an ap-

propriation of the lumber to the contract. The thing contracted for thereby became specific, and what was formerly a mere executory contract for a sale became an executed sale, and the title to the lumber passed to the purchaser. "A sale may be defined as the transfer of the title of a chattel from seller to buyer by a contract whose consideration is a price in money. By this definition is intended an *executed* sale where the agreement is both contract and conveyance, and the title passes to the buyer; but there may also be an executory sale, *i. e.*, an agreement for a sale which is contract only, and not a conveyance, leaving the title as yet in the seller. The executed sale must be carefully distinguished from the executory, for whether the title *has as yet passed* becomes a question of the utmost importance when the chattel perishes, the doctrine being that 'loss follows the title'—*res perit domino.*" Graves' Personal Property, sec. 38, p. 40.

[17] We have discussed the subject of the passing of title as if the loss necessarily followed the title, because in the instant case the sellers did not claim any lien upon the sugar, or to have withheld the title thereto as a security for the purchase money. They parted with all dominion over it. No question was involved of title in the seller and liability for loss on the buyer, hence counsel on both sides very properly confined their argument to the question whether or not title passed to the buyer, for if it did, under the circumstances of the case, the general doctrine applied, that loss follows the title, *res perit domino.* But there are cases where the risk of loss follows the possession of the buyer, although the title remains in the seller. This is dependent upon the intention of the parties, which may be express or implied. The intention may be ascertained from the nature of the transaction as well as from the language and conduct of

the parties. The most notable instance of a severance of the title and liability for loss is that of a conditional sale, though there are other instances. See 2 Williston Contracts, sec. 966; Graves Per. Prop., sec. 52; *Harkness* v. *Russell*, 118 U. S. 663, 7 Sup. Ct. 51, 30 L. Ed. 285. As to reservation of title to secure purchase money, see *Greenwood Grocery Co.* v. *Canadian, &c., Co.*, 72 S. C. 450, 52 S. E. 191, 2 L. R. A. (N. S.) 79, 110 Am. St. Rep. 627, 5 Ann. Cas. 261; *Collins* v. *Seaboard Air Line R. Co.*, 187 N. C. 141, 120 S. E. 824, and cases cited; *Spence* v. *Norfolk & W. R. Co.*, 92 Va. 102, 22 S. E. 815, 29 L. R. A. 578.

Our conclusion is that it was the duty of the court, in the instant case, and not of the jury, to construe the contract, and that instruction No. 1, given for the plaintiffs, was a proper construction of it.

It is unnecessary to consider the other assignments of error, as what has been said disposes of all the rulings of the trial court on the instructions, and it is said in the petition, "If the court was correct in giving instruction No. 1 * * then there was no error in its action refusing to set aside the verdict and award the defendant a new trial."

*Affirmed.*