HARRISON COMBS, TRUSTEE, ETC., ET AL.

V.

DICKENSON-WISE MEDICAL GROUP, ET AL.

Record No. 840092

April 24, 1987

Present: Carrico, C.J., Cochran,* Poff, Compton, Stephenson, Russell, and Thomas, JJ.

---

*Justice Cochran participated in the hearing and decision of this case prior to the effective date of his retirement on April 20, 1987.

*Stuart B. Campbell, Jr. (William F. Hanrahan; Jeffrey B. Cohen; Campbell, Young & Hodges*, on briefs), for appellants.
*William J. Sturgill (Kenneth P. Asbury; Sturgill & Sturgill, P.C.*, on brief), for appellees.

CARRICO, C.J., delivered the opinion of the Court.

In the court below, Dickenson-Wise Medical Group, a professional corporation (Medical Group), and Southwest Virginia Community Health Services, Inc., a non-stock, non-profit corporation (Health Services), filed separate motions for judgment against the United Mine Workers of America Health and Retirement Funds (the Funds), and Julius Mullins, Kenneth L. Houck, and Paul R. Dean, Trustees of the Fund (the Trustees). Each motion for judgment alleged that the defendants were indebted to the particular plaintiff "upon an open account" for "medical service, pharmacy, laboratory and health services" rendered to beneficiaries of the Funds.

Each motion for judgment also alleged that the Funds transacted business in Wise County, Virginia, and that Mullins, Houck, and Dean were trustees of the Funds with offices in Washington, D.C.[1] Process against the Funds and the Trustees was

---

[1] At the time of trial, Harrison Combs, John J. O'Connell, and Paul R. Dean, were trustees of the Funds.

served on the Secretary of the Commonwealth, who forwarded copies of the process to them at their Washington address.

The Funds and the Trustees filed motions to quash the service of process, alleging that they were not "persons" within the meaning of Virginia's Long Arm Statute and, therefore, that the service upon them was not valid. The Funds also filed motions to dismiss in which they asserted that they were a "trust and [could not] be sued as a legal entity."

The trial court granted the Funds' motions to dismiss, holding that they could not be "sued as an entity" and could "only be reached by suing the trustees in their representative capacity." The court denied the Trustees' motions to quash service of process and consolidated the two actions for trial against the Trustees only.

In separate verdicts, a jury awarded Medical Group $387,201.96 and Health Services $1,019,850.95. The trial court reduced the awards to $336,162.96 and $948,285.95, respectively, and entered judgment on the verdicts, as reduced, against the Trustees.

On appeal, the first question posed by the Trustees is whether they were "amenable to service of process under the Virginia Long Arm Statute." They argue that they are not "persons" within the intendment of the statute and, hence, not amenable to service of process thereunder.

■ The Long Arm Statute is contained in Chapter 9 of Title 8.01 of the Code, consisting of §§ 8.01-328 to -330. Section 8.01-328.1 provides that a court may exercise personal jurisdiction over a person who, among other things, transacts "any business in this Commonwealth." Section 8.01-329 provides that when personal jurisdiction is exercised over a nonresident party as authorized by Chapter 9, process or notice may be served on the Secretary of the Commonwealth as the statutory agent of "such person." Section 8.01-328 reads:

*Person defined.* — As used in this chapter, "person" includes an individual, his executor, administrator, or other personal representative, or a corporation, partnership, association or any other legal or commercial entity, whether or not a citizen or domiciliary of this State and whether or not organized under the laws of this State.

The Trustees say "[i]t is noteworthy that [§ 8.01-328] does not refer to nonresident trustees." They also point out that the remainder of the Long Arm Statute "does not mention Trustees or trusts situated outside of the Commonwealth of Virginia."

■ We do not consider significant, however, the General Assembly's failure to use the specific term "trustee" in the Long Arm Statute. The definition of the term "person" in Code § 8.01-328 is all inclusive, sufficient to bring within the ambit of the statute every natural or fictitious entity capable of performing the acts, such as transacting business, which are made the basis for the exercise of personal jurisdiction over a nonresident. *See* Code § 8.01-328.1.

■ Given the broad language of § 8.01-328, we are constrained to ask: If an "individual" acting as a trustee is not a "person" and the office of trustee is not a "legal entity," what are they? We think the question answers itself, and, accordingly, we hold that the trial court did not err in denying the Trustees' motions to quash the service of process.[2]

This brings us to the principal question in the case, *viz.*, whether the evidence supports the verdicts in favor of Medical Group and Health Services. The evidence shows that these two organizations were established "to cooperate with the Funds in providing . . . quality medical service" for the members of the United Mineworkers of America and their dependents. The Funds supplied the money, Medical Group provided the "physician resource," and Health Services furnished "the back-up services," including office space, pharmacies, laboratories, x-ray facilities, and

---

[2] The Trustees cite *Lewis v. Hogwood*, 300 F.2d 697 (D.C. Cir. 1962), which, they contend, concerns "a similar Tennessee statute involving a suit against the UMWA Welfare and Retirement Fund." The court held in *Lewis* that because the Fund was "not a corporation or unincorporated association . . ., service could not be made upon its trustees under the Tennessee statute covering unincorporated associations or organizations." *Id.* at 698 n.9. Tennessee's Long Arm Statute, however, was not enacted until 1965, some three years after the *Lewis* decision. At the time of *Lewis*, Tennessee's statute relating to the exercise of jurisdiction over nonresidents apparently applied only to corporations. Comment, *Expanded in Personam Jurisdiction — Due Process and the Tennessee Long Arm Statute*, 1966 Tenn. L. Rev. 371, 379, 386. *Lewis*, therefore, is inapposite.

The Trustees also cite *Yonce v. Miners Memorial Hospital Ass'n*, 161 F. Supp. 178 (W.D. Va. 1958). That case, however, involved the question whether the UMWA Welfare and Retirement Fund could be held liable in damages for a violation of the Sherman Antitrust Act. The trustees of the fund were not made parties, and the case did not concern the question presented here, *viz.*, whether a nonresident trustee who is a party may be served with process under legislative provisions similar to Virginia's Long Arm Statute.

nursing care. Services were provided "in at least seven different communities" in Southwest Virginia, involving approximately 28 physicians and 198 "support personnel."

In the early period of operation, financial arrangements between the Funds on the one hand and Medical Group and Health Services on the other was "somewhat nebulous." Improper budgeting practices resulted in unplanned indebtedness and caused "panic" appeals to the Funds for additional money.

Then, in 1968, Berton Williams, a certified public accountant with prior experience in hospital administration, was employed as Business Manager of Medical Group and Administrator of Health Services. Representatives of the Funds, Medical Group, and Health Services began meeting in each quarter of the year, beginning with the February-April quarter, to prepare budgets for the next quarter.

Described by Williams as a method by which Medical Group and Health Services recovered their "reimbursable costs," the budget for a particular quarter was based upon the cost of services rendered to Fund beneficiaries in the preceding quarter, adjusted upward or downward from time to time and occasionally increased to reflect the costs of expanding facilities. Once the budget conferees established an amount for an upcoming quarter, a letter agreement, termed a "retainer agreement," was prepared and signed. Medical Group and Health Services would then invoice the Fund for one-sixth of the agreed amount twice a month for three months. For example, costs incurred during February, March, and April of a given year would constitute the budgeted figure for May, June, and July of that year and would be paid in six installments during the latter months.

At the end of the February-April quarter of 1977, the conferees met and agreed on the cost of services for those months and established the agreed figure as the budgeted amount to be paid during May, June, and July. In June, however, the Funds notified Medical Group and Health Services that the retainer method of payment would cease and be replaced by a "fee-for-service" basis of compensation, that is, bills were to be rendered and paid according to a "fixed schedule of fees" for "each patient seen." Retainer payments for physicians and most other services ended June 30, but Health Services continued to invoice its pharmacy costs according to retainer agreements until the early part of December, 1977.

The termination of retainer payments sparked the present controversy. Following the termination, Williams wrote the Funds on behalf of Medical Group and Health Services and made claim for the cost of services incurred by the two organizations during April, May, and June, 1977.

Williams explained in his letter that under the retainer system for reimbursing prior-quarter expenses, unless the amount fixed for the next-quarter budget was paid in full, then the prior costs would not be recovered fully. Williams claimed this was the case when the budget for May, June, and July, 1977, was "cut off at the end of June for services rendered in February, March and April, 1977." He also maintained that the "above items of cost did not present a problem as long as the retainer system was ongoing but it does present a problem when it is discontinued."

In his testimony, Williams said that the Funds made payments in May and June, 1977, to cover the February and March expenses but did not pay the April, May, and June costs. He also stated that costs related to the pharmacies operated by Health Services were not paid for September, October, November, and part of December, 1977.

Three physicians affiliated with Medical Group also testified for the plaintiffs. They confirmed Williams' testimony concerning the retrospective nature of the financial arrangement by which Medical Group and Health Services were compensated for their services. These doctors also confirmed Williams' testimony that the expenses for April, May, and June, 1977, and the pharmacy expenses for September, October, November, and part of December, 1977, had not been paid.

Several witnesses affiliated with the Funds testified for the defense. One witness described the retainer agreements as "a commitment made to pay a certain amount of money periodically . . . in advance of rendering of the service." Another witness denied that a retainer agreement reflected "how much was owed from the last time" and stated that the agreement showed only "what [the Funds] were going to pay the next three months."

Two defense witnesses, however, agreed with the plaintiffs' view that the retainer arrangement was retrospective in nature. One said the arrangement constituted a "reimbursement agreement." The other said that "[i]n the retainer arrangement [the Funds] would reimburse [Medical Group and Health Services] every two weeks an amount predicated on the cost for the previous quarter."

And even one of the defense witnesses who espoused the prospective view of the retainer arrangement admitted that the cost of a new service that "was not in the previous quarter's reimbursement analysis . . . obviously [would be thrown] into the next quarter to make that up."

With respect to payment of the expenses for April, May, and June, 1977, and the costs of the pharmacies for September, October, November and the first part of December, 1977, one defense witness testified that "[a]s far as [he knew], those last three months' services were paid with the last retainer." Another defense witness stated that "[t]he best [he could] recall, drugs were paid for in full . . . [u]p until [December of 1977]."

The Funds, however, do not rely upon these denials concerning unpaid expenses, but, instead, emphasize the effect of the invoices submitted by Medical Group and Health Services. The Funds say the invoices were "for services performed for a period immediately preceding the sending of the invoice." For example, the Funds submit, an invoice dated June 23, 1977, for the last period retainer agreements were effective, stated it was for "inclusive dates of service: from 6/1/77 through 6/15/77" and was supported by data showing the specific services rendered during that period.

Citing *Camp* v. *Wilson*, 97 Va. 265, 33 S.E. 591 (1899), the Funds argue that when Medical Group and Health Services submitted periodic invoices for services rendered over the years and accepted payment without protest, the invoices became accounts stated and barred Medical Group and Health Services from recovering for amounts allegedly accruing prior to the dates of payment. We do not believe, however, that *Camp* is helpful to the Funds.

In *Camp*, the defendant agreed to provide the timber to be cut and delivered by the plaintiff to the defendant. On a monthly basis, the amount of timber cut and delivered by the plaintiff was ascertained and an account was made out and paid by the defendant. When the work was completed, the plaintiff sued the defendant for damages allegedly sustained as a result of the defendant's delay in providing the timber to be cut and delivered. The plaintiff recovered judgment in the trial court.

This Court stated that if the monthly settlements were made by the defendant and accepted by the plaintiff without protest or notice of a purpose to hold the defendant liable for damages, the settlements were conclusive in favor of the defendant. We reversed

the judgment, however, to permit a jury to decide whether the settlements were made "with knowledge upon [the defendant's] part that he was to be held responsible in the final settlement between himself and [the plaintiff] for the damage claimed in [the plaintiff's] declaration." *Id.* at 272, 33 S.E. at 593.

Here, the Funds maintain, the parties agreed to quarterly settlements, invoices were regularly submitted and paid on a semi-monthly basis, and payments were accepted without protest by Medical Group and Health Services. Under these circumstances, the Funds submit, Medical Group and Health Services "should not now be allowed to go behind the semi-monthly payments and claim additional amounts." The Funds conclude that "[a]s a matter of law under the doctrine of *Camp*," Medical Group and Health Services cannot go behind the payments.

The Funds, however, overlook a passage from the *Camp* opinion which is pertinent here. Discussing whether the construction of a written agreement should be made by the court or submitted to a jury, this Court stated:

> [Ordinarily it] is the duty of a court to construe a written contract, but whenever it is necessary to refer to testimony of witnesses in order to ascertain the contract, or to ascertain facts in the light of which the contract is to be construed, then the court is bound to refer such controverted matters of testimony to the decision of the jury.

*Id.* at 270, 33 S.E. at 592. *See also Geoghegan* v. *Arbuckle Bros.*, 139 Va. 92, 101, 123 S.E. 387, 389 (1924).

The Funds insist, however, that "[t]his is not a case of conflicting evidence . . . but of the legal conclusions to be drawn from the evidence." The court below simply reached erroneous conclusions, the Funds say, and, hence, the judgments appealed from should be reversed.

> But it is not necessary that the evidence should be conflicting in order to refer the construction [of a contract] to the jury, it is sufficient if, when all the evidence is in, both written and oral, fairminded men might reasonably arrive at different conclusions.

*Id.* at 101, 123 S.E. at 389 (citation omitted).

■ We think the disposition of this case turns not upon the content of the invoices upon which the Funds place so much reliance but upon the terms of the written retainer agreements pursuant to which the invoices were submitted and paid. And we have no hesitation in saying it was absolutely necessary to refer to the testimony of witnesses to ascertain the true meaning of the retainer agreements.

■ We think further that the evidence was conflicting on the crucial questions whether the retainer agreements were retrospective or prospective in nature and whether all the expenses incurred by Medical Group and Health Services were paid. But, whether conflicting or not, it is certain that fair-minded persons might reasonably arrive at different conclusions with respect to the evidence. We hold, therefore, that it was not error for the trial court to submit the case to the jury and that sufficient evidence supported the jury's verdicts.

Finally, the Funds contend that the amounts awarded by the jury were excessive. The Funds argue that there was no evidence of an express promise on their part to pay the amounts awarded and that "[i]n the absence of an express promise to pay an agreed amount, there could be no express contract."

■ What this argument amounts to is the same argument the Funds have already made, that Medical Group and Health Services are not entitled to recover anything, and we have just disposed of that question. In any event, if the jury believed, as it was entitled to believe, that the Funds had not compensated Medical Group and Health Services fully, the jury was free to fix such amount within the range of the testimony as it found necessary to provide full compensation. The jury obviously thought the amounts awarded were necessary for this purpose. The verdicts were within the range of testimony and, hence, were supported by evidence, albeit the trial court felt compelled to reduce the awards.[3]

---

[3] The trial court reduced the jury awards by amounts representing "the difference in billing for a 45 day period in 1976," for which the Funds advised Medical Group and Health Services "there would be a retainer adjustment effective March 16, 1976." Medical Group and Health Services asked that the retainers be made effective from the start of the quarterly period, February 1, 1976. The Funds denied the request. Because Medical Group and Health Services made no written protest and made no claim for "this 45 days delayed billing at the time of . . . subsequent settlements," the trial court held the claim was barred.

We will affirm the judgments of the trial court.

*Affirmed.*