NEHI BOTTLING COMPANY, INCORPORATED, Plaintiff–Appellant,

v.

ALL–AMERICAN BOTTLING CORPORATION, Defendant–Appellee.

John ARMES, Plaintiff–Appellee,

v.

ALL–AMERICAN BOTTLING CORPORATION, Defendant–Appellant.

Nos. 92–1139, 92–1140.

United States Court of Appeals, Fourth Circuit.

Argued June 8, 1993.

Decided Oct. 25, 1993.

Gregory Stephen Matney, Katz, Kantor, Perkins & Campbell, Tazewell, VA, argued (Douglas G. Campbell, Katz, Kantor, Perkins & Campbell, on the brief), for plaintiff-appellant.

John Robert McGhee, Jr., Kay, Casto, Chaney, Love & Wise, Charleston, WV, argued (Stephen A. Weber, Kay, Casto, Chaney, Love & Wise, on the brief), for defendant-appellee.

Before WILKINSON, Circuit Judge, SPROUSE, Senior Circuit Judge, and G. Ross ANDERSON, Jr., United States District Judge for the District of South Carolina, sitting by designation.

## OPINION

SPROUSE, Senior Circuit Judge:

This appeal involves a sales contract and a lease and actions based on each of them. Nehi Bottling Company, Inc. ("Nehi") brought the first action against All–American Bottling Corporation ("All–American") alleging that All–American sold, and thereby converted, certain properties of Nehi not covered under a purchase agreement. The second action was brought individually by John Armes, the president of Nehi, and involved a lease between Armes, who is one of the owners of three leased buildings, and All–American. Armes claimed that All–American owed additional lease payments because of All–American's holdover beyond the lease term and that All–American was responsible for physical damages to the leased property. The conversion action and the lease action were consolidated for trial and a jury returned judgment for Nehi and Armes on all claims: $52,782 on the conversion claim; $47,878.54 on the holdover claim; and $15,749 on the claim for physical damage to the building. The district court, however, granted All–American's motion for judgment notwithstanding the verdict on the conversion claim. It denied All–American's motions for judgment notwithstanding the verdict and for a new trial on the lease claims. Nehi appeals from the district court's grant of judgment notwithstanding the verdict in favor of All–American on the conversion claim. All–American appeals from the judgment in favor of Armes on the lease claims.

As to the conversion claim, Nehi contends that the district court erred in holding that the purchase agreement executed between Nehi and All–American was unambiguous and in applying the agreement's provisions to require a j.n.o.v. for All–American. As to the judgment in the action involving the lease, All–American challenges the court's refusal to grant a j.n.o.v. or a new trial on the issue of holdover and physical property damages and also argues that the court erred in allowing the testimony of an expert witness. We reverse in part, reinstating the jury verdict on the conversion issue, but affirm the judgment in all other respects.

Nehi, terminating its bottling business in Bluefield, West Virginia, agreed to sell its business and the personal property involved in the plant's operation to All–American, a company which also produces and sells soft drinks. All–American attorneys prepared an "Asset Purchase Agreement," under which Nehi agreed to "sell substantially all of the assets and properties utilized in the operation of the Business," excluding cash and accounts receivable. The agreement referred to "Purchased Assets" and stated that complete lists of the items included in the Purchased Assets were set forth in Schedules 2(a)–2(d). The provision fixed the purchase price by stating that All–American was to pay Nehi a "Fixed Purchase Price" of $100,000 plus an "Inventory Purchase Price," which included inventory specified in Schedule 2(a). Schedules 2(a)–2(d) were to be attached to the contract. The fixed purchase price of $100,000 was paid and was not an issue in the litigation. The parties, however, failed to draft Schedules 2(a)–2(d), and there subsequently developed a dispute as to what inventory items were covered in the Asset Purchase Agreement. The day after signing the agreement, the parties executed a document entitled "Bluefield Inventory 11–28–84." It consisted of a list of inventory items deemed usable and salable by All–American but made no reference to the purchase agreement. The items on the Bluefield Inventory totaled $91,501.28.

The parties disagree over the purpose of the Bluefield Inventory. Nehi contends that its purpose was to compile a list of inventory to be conveyed by Nehi to All–American. Inventory not on the list, therefore, remained Nehi's property. All–American contends, however, that under the terms of the Asset Purchase Agreement, All–American purchased all of the assets of Nehi's business except for cash and accounts receivable. The purpose of the Bluefield Inventory, according to All–American, was to determine which items were to be used in calculating the "Inventory Purchase Price" portion of the total purchase price, as specified in the agreement.

The Inventory was compiled from an inspection at Nehi's Bluefield plant by Glen Thomas, All–American's General Manager, and Robert Armes, a member of the family that owned all of the stock in Nehi. During the inspection, Thomas advised Robert Armes that All–American could not use certain Nehi inventory, which consisted of bottles, cartons, concentrate, and other bottling plant supplies. In response, Robert Armes responded, "Okay," or "Just leave it sit." Nehi vacated the building, leaving the excess inventory. All–American changed the Nehi bottling plant into a warehouse. During this change, All–American removed inventory items not listed on the Bluefield Inventory from the facility. It either sold the items, transported them to its other plants, or otherwise disposed of them.

During the period when All–American was removing the unlisted inventory, one of Nehi's former employees, who then worked for All–American, advised John Armes that All–American was removing inventory not on the Bluefield list. In the fall of 1986, counsel for Nehi contacted All–American and demanded compensation for these inventory items, claiming that they had not been purchased by All–American. All–American rejected the demand.

Meanwhile, John Armes had entered into a lease agreement with All–American for three bottling plant buildings in Bluefield.[1] The

six-month lease required All–American to pay $505 per month in rent plus pro rata fire insurance, liability insurance, and county and town taxes. Under the lease, Armes was responsible for all major repair and maintenance of the property, including the roof, and All–American was responsible for "routine maintenance and housekeeping." The lease was renewable "for an additional six (6) month period, or more."

During its initial six-month lease period, All–American discovered that it could not operate profitably from the facility. In June of 1985, at the end of its six-month lease, All–American did not renew its lease, stopped paying rent, and ceased operations on the premises. However, the company continued to store obsolete equipment there. Whether Armes acquiesced to the equipment remaining on the premises was a disputed factual issue. In any event, several months after the lease expired, Robert Armes prevented All–American from removing some of the equipment still stored there, claiming that it owed back rent. All–American then entered into an agreement with John Armes under which All–American would sell a piece of equipment and divide the sale proceeds with John Armes. All–American subsequently sold the equipment and sent John Armes a check for $4,800. At the time of the trial, other equipment owned by All–American remained on the premises.

At trial, John Armes testified that he had not attempted to re-rent the property and that he had had opportunities to sell the property. He claimed that the premises were unusable because (1) All–American's equipment remained on the premises, and (2) All–American had caused extensive damage to the building. As to the building damage, approximately five weeks after All–American left the plant, Robert Armes entered it and found that the building had been damaged by water leaking from ruptured water pipes or through a crack in the roof. It was undisputed that All–American left the building unheated in January and February of 1985. At trial, the parties' experts had different views

1. The buildings were integral parts of the bottling business complex. John Armes and his

family owned the buildings.

as to the cause of the damage. All–American's expert testified that the damage to the building could have been caused by construction defects in the roof, deterioration, and/or vandals, and Armes' expert testified that the crack in the roof was caused by the expansion of frozen water due to the lack of heat in the building. The water allegedly damaged the syrup room ceiling, the office ceiling, and the office carpet. Along with water damage, there was additional physical damage to the building including twelve broken window panes, a damaged front door, a damaged garage door, and ripped mesh wire on a basement window.

On August 14, 1987, Nehi sued All–American in the United States District Court for the Western District of Virginia for wrongful conversion of assets not included in the purchase agreement. It demanded $76,162.45 in damages. Also, on that day, John Armes brought an action against All–American in the same court alleging that All–American continued to occupy the premises as a holdover tenant and owed Armes rent, taxes, and insurance premiums under the lease. He demanded $76,908.08 in damages. In addition, Armes claimed $27,891 for physical damage to the building. The cases were consolidated and after a trial, the jury returned a verdict for Nehi of $52,782 on the wrongful conversion claims and awarded Armes $47,878.54 in holdover damages and $15,749 in physical damages on the lease claims. All–American moved for a judgment notwithstanding the verdict on the conversion claim. It argued that the purchase agreement was unambiguous and that the damages demanded by Nehi on the conversion claim were too speculative. The magistrate granted the motion.[2] All–American also moved for a judgment notwithstanding the verdict and a new trial on the lease claims. It challenged the jury's finding of a holdover tenancy and its liability for physical damages. It also claimed that Armes failed to mitigate damages and that the court had erred in allowing an expert witness of Armes to testify regarding the cost of removing the obsolete equipment from the premises. The magistrate denied all of All–American's mo-

tions regarding the lease claims. Nehi appeals the district court's j.n.o.v. on its conversion verdict and All–American appeals the court's denial of its motion relating to the judgment against it in the lease action. We consider first the issues raised in the conversion dispute.

## I

■ The issues involved in the appeal of the j.n.o.v. on the conversion claim center on the bottles and other assets sold by All–American in which Nehi claims it had retained ownership. The district court permitted the introduction into evidence of the so-called Bluefield Inventory, although in the contract there was no reference to it or to a procedure for composing it. In granting All–American's motion for a j.n.o.v., however, the court ruled that the contract was not ambiguous and that the purpose of the Bluefield Inventory was to establish the "Inventory Purchase Price" portion of the total purchase price, as specified in the contract. Nehi strenuously urges, however, that the contract was ambiguous and that the court erred in holding otherwise. We agree that the contract was ambiguous and that its meaning was properly a question for the jury.

■ The Supreme Court of Virginia has defined ambiguity as "the condition of admitting of two or more meanings, of being understood in more than one way, or of referring to two or more things at the same time." *Management Enters., Inc. v. Thorncroft Co.*, 243 Va. 469, 416 S.E.2d 229, 231 (1992) (quoting *Berry v. Klinger*, 225 Va. 201, 300 S.E.2d 792, 796 (1983)). The question of ambiguity, of course, is a legal question to be determined in the first instance by the court. *Wilson v. Holyfield*, 227 Va. 184, 313 S.E.2d 396, 398 (1984). The general rule is that when a written contract is clear and unambiguous, it is the duty of the court, not the jury, to determine its meaning. *Winn v. Aleda Constr. Co.*, 227 Va. 304, 315 S.E.2d 193, 194 (1984). If a contract that manifests ambiguities may be rendered clear and unambiguous by extrinsic evidence which has

---

**2.** The magistrate denied only that portion of the motion which related to an account receivable in

the amount of $2,665.05. All–American does not appeal this denial.

been properly admitted, it is the duty of the court to construe the contract in the light of such evidence. However, "if the situation is such that fair-minded men might reasonably draw different conclusions [from the evidence], then the construction of the contract is for the jury under proper instructions from the court, even though the evidence [is] not conflicting." *Geoghegan Sons & Co. v. Arbuckle Bros.,* 139 Va. 92, 123 S.E. 387, 389 (1924).

■ Our threshold question, then, is to determine whether the contract is unambiguous. *See Anden Group v. Leesburg Joint Venture,* 237 Va. 453, 377 S.E.2d 452, 455 (1989). Since contract construction is a question of law, we review the district court's findings *de novo, Wilson,* 313 S.E.2d at 398. We are persuaded that the contract is ambiguous. In the first place, the agreement referred to "Purchased Assets" listed on Schedules 2(a)–2(d) and defined that list as a complete list of the assets to be purchased by All–American. There were, however, no such schedules attached. In addition to the language creating that confusion, the agreement stated that "substantially all of the assets" of the business were to be sold, but this was never quantified. No matter what expertise a party might have in the bottling business, we cannot conceive from this language that he or she could understand what assets were being sold.

■ Since the language of the purchase agreement was ambiguous, extrinsic evidence in the form of the Bluefield Inventory and related testimony was properly admitted to determine the intentions of the parties in defining the contract terms. True, the purpose of the Bluefield Inventory was not designated in the document itself, and there was conflicting testimony regarding whether it represented a complete list of assets to be sold. It follows, however, as was said in *Combs v. Dickenson–Wise Medical Group,* 233 Va. 177, 355 S.E.2d 553, 557 (1987) (quoting *Camp v. Wilson,* 97 Va. 265, 33 S.E. 591, 592 (1899)), that "whenever it is necessary to refer to testimony of witnesses in order to ascertain the contract, or to ascertain facts in the light of which the contract is to be construed, then the court is bound to refer such

controverted matters of testimony to the decision of the jury." Here, the jury was properly instructed on the law of ambiguity and on its role in resolving the factual issues. The question of the parties' intentions was within its fact-finding mission and that is where it should have remained.

A trial court may not enter a j.n.o.v. unless it concludes that there is no evidence on which the jury could have properly based its verdict. *Lust v. Clark Equip. Co.,* 792 F.2d 436, 437 (4th Cir.1986). We review under the same standard. *Miller v. Premier Corp.,* 608 F.2d 973, 981 n. 8 (4th Cir.1979). Under this standard, we are persuaded that the district court erred in granting the j.n.o.v. In our view, a reasonable jury could have found from all of the evidence that the parties intended the Bluefield Inventory to carry the same burden originally intended for Schedules 2(a)–2(d), that is, to provide a complete list of the assets to be purchased by All–American. Thus, a jury could find that the assets not on the list, which were sold or disposed of by All–American, were converted. The j.n.o.v. is reversed and the jury verdict awarding damages to Nehi for conversion of its property is reinstated.

## II

### A. *The Holdover Award*

■ The undisputed evidence was that at the termination of its six-month lease period, All–American did not renew its lease and discontinued rent payments to John Armes, the lessor. It ceased all operations on the premises. All–American concedes, however, that it left considerable equipment on the premises, most of which was still there at the time of the lawsuit. It argues nevertheless that it abandoned the premises at the termination of its principal six-month lease and contends, at least impliedly, that there cannot be a holdover after an abandonment. It argues that its leaving of personal property on the leased premises does not factor into that issue.

■ Abandonment of a lease by a tenant occurs when two elements are met: 1) vacation of the premises and 2) a clear intent not to be bound by the lease. *tenBraak v. Waf-*

*fle Shops, Inc.*, 542 F.2d 919, 924 n. 5 (4th Cir.1976). To vacate is "to make vacant or empty ... especially, to surrender possession by removal; to cease from occupancy." *Black's Law Dictionary* 1548 (6th ed. 1990). All–American's act of leaving equipment on the property obviously does not meet this commonly understood definition of abandonment.

■ Regardless of whether it is held to have abandoned the lease, All–American urges that, as a matter of law, its actions in leaving the equipment in the building did not rise to the level of a "holdover." We agree, however, with the trial court that the issue here was not one of law but of fact for the jury's resolution. Holdover occurs when a tenant in possession under a lease continues in possession beyond expiration of the lease. *Grice v. Todd*, 120 Va. 481, 91 S.E. 609 (1917), is the earliest reported Virginia case dealing with the holdover rule. There, a tenant retained furniture on leased premises for three days after expiration of his one-year lease. The Virginia Supreme Court of Appeals recognized the normal rule that a tenant's retention of leased premises after the expiration of a term results in an implied contract for an additional full term. It held, however, that such an implied contract was a creature of equity and in *Grice*, since the circumstances were beyond the control of the tenant (he could not timely obtain a wagon to haul his furniture), equity required a different result. It held that under those circumstances, the tenant would not be liable under an implied contract of tenancy from year to year. *Id.* 91 S.E.2d at 611. This rule with ramifications, including liability of a tenant for non-periodic holdover damages, was enacted in 1919 as § 5517 of the Virginia Code. 1 Raleigh Colston Minor, *The Law of Real Property* § 367 at 475–76 & n. 8 (2d ed. 1928). The statute now provides that:

> A tenant from year to year, month to month, or other definite term, shall not, by his mere failure to vacate the premises upon the expiration of the lease, be held as tenant for another term when such failure is not due to his willfulness, negligence or other avoidable cause, but such tenant shall be liable to the lessor for use and occupation of the premises and also for any loss or damage sustained by the lessor because of such failure to surrender possession at the time stipulated.

Va.Code Ann. § 55–223 (Michie 1986).

All–American admits that it adapted the building to use as a warehouse and that it continued to store equipment there from 1985 until the time of trial in 1991. It contends, however, that Armes engaged in conduct that was consistent with termination of All–American's lease at the end of its first six-month term. It also argues that Armes made no effort to release or to sell the building. These circumstances, at most, however, create factual issues, and the court correctly instructed the jury in the language of § 55–223 that All–American could not be found to be a tenant from term-to-term solely by reason of its failure to vacate the premises upon expiration of the first term but could be found liable for use and occupancy of the premises and for any loss or damages sustained by Nehi because of All–American's failure to surrender possession at the end of its six-month term in 1985.

In the original lease agreement, All–American agreed to pay county and town taxes and insurance on the building. There was received into evidence, without objection, Plaintiff's Exhibit 3 showing county taxes for the period 1985 to 1990, totaling $4,609.08; town taxes for the same period totaling $2,100; and insurance payments for the period 1985–1991 totaling $30,349. John Armes testified that, despite its agreement to do so, All–American paid none of these items and that Armes paid them personally. The court instructed the jury that

> if you find by a preponderance of the evidence that the defendant, All–American Bottling Corporation, has continued to use and occupy the premises after the expiration of the lease term, you shall find in favor of the plaintiff, John Armes, on this issue and award damages, if any, that the plaintiff, John Armes, has proven, by a preponderance of the evidence, that he sustained as a direct and natural result of defendant's, All–American Bottling Corporation, failure to surrender possession.

There was no discussion, formally or otherwise, by either of the parties or by the magistrate concerning a specific finding as to the period of holdover. There was, however, undisputed evidence that the same equipment belonging to All–American remained on the premises up to the time of trial. Presumably, the jury based its calculation of damages on that period, giving credit for rent actually paid. Exhibit 3 showed rent due as $505 a month, which totaled $29,350 for the period claimed. It was shown that Armes paid $30,349 for taxes and insurance. The instructions on the holdover issues were not a model of clarity, but the parties not only failed to object to the instructions, they actually approved them. In light of this acquiescence and viewing the instructions as a whole, we think the magistrate correctly informed the jury as to the controlling law. The question of whether and for how long All–American continued to use and occupy the premises after the expiration of the lease term was for the jury, and the court properly refused to disturb its finding.

### B. *Damages for Injury to the Building*

■ The jury awarded $15,000 to Armes for damages caused by All–American's negligent failure to maintain heat in the building. All–American contends that the damages either resulted from other causes or were not foreseeable. In our view, however, these questions involved factual issues which were submitted to the jury on proper instructions, and we find no error in the district court's refusal to interfere with that portion of the verdict.

### C. *Testimony of Barnes Kidd*

■ All–American contends that the district court erred in allowing the testimony of expert witness Barnes Kidd, since the identity of Kidd was not disclosed to All–American until the day before trial. All–American also argues that Kidd testified on an issue not fairly raised in the pleadings: the cost to remove All–American's equipment from the leased property. We find no error in the district court's allowance of Kidd's testimony on this issue. Although Armes did not identify Kidd in response to All–American's inter-rogatories regarding the identity of expert witnesses, Armes provided advance notice to All–American of his intent to call Kidd. Moreover, the district court had required Armes to make Kidd available to All–American for an interview prior to his testimony. A party must seasonably supplement its responses with regard to the identity of each expert witness at trial and the subject matter of the expert's testimony. Fed.R.Civ.P. 26(e)(1)(B). The district court enforces this rule under a grant of broad discretion, *Persinger v. Norfolk & W. Ry.*, 920 F.2d 1185, 1187 (4th Cir.1990), and we find no abuse in its ruling allowing Kidd's testimony. Nor was there error in the submission to the jury of the issue of the failure to mitigate damages.

In view of the above, the judgment of the district court is affirmed in part; reversed in part; and remanded with directions to reinstate the jury verdict in favor of Nehi on the conversion claim.

*AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.*