| Education level | % of SC | % of venire |
|---|---|---|
| Less than 9th grade | 11.8% | 0% (0/76) |
| 9–12th grade | 18.7 | 3.9 (3/76) |
| High school (or GED) | 30.3 | 32.9 (25/76) |
| Some college, no degree | 18.2 | 23.7 (18/76) |
| Associate degree | 6.0 | 9.2 (7/76) |
| Bachelors degree | 10.4 | 25.0 (19/76) |
| Graduate/professional degree | 4.6 | 5.3 (4/76) |

**ATKINSON DREDGING COMPANY,**
Plaintiff,

v.

**ST. PAUL FIRE & MARINE INSURANCE COMPANY,**
Defendant.

No. 2:93cv753

United States District Court,
E.D. Virginia,
Norfolk Division.

Nov. 8, 1993.

Walter B. Martin, Jr., Vandeventer, Black, Meredith & Martin, Norfolk, VA, for Atkinson Dredging Co.

John R. Crumpler, Jr., Kaufman & Canoles, P.C., Norfolk, VA, for St. Paul Fire & Marine Ins. Co.

## OPINION

PRINCE, United States Magistrate Judge.

Plaintiff, Atkinson Dredging Company ("Atkinson"), has filed a complaint against defendant, St. Paul Fire & Marine Insurance Company ("St. Paul"), seeking a declaratory judgment, pursuant to 28 U.S.C. § 2201 and Fed.R.Civ.P. 57, that under the terms of an ocean marine excess insurance policy issued by St. Paul to Atkinson, St. Paul is liable to Atkinson for that portion of any settlement or judgment in a case pending against Atkinson in the United States District Court for the Eastern District of North Carolina which Walbrook Insurance Company ("Walbrook"), one of Atkinson's primary carriers, is unable to pay because of insolvency.

In response, St. Paul filed a motion for summary judgment (Docket Entry # 5) on the ground that there is no genuine issue as to any material fact. In support of its motion, St. Paul filed its Brief In Support Of Motion For Summary Judgment and attached as exhibits unverified copies of the excess policy and of a schedule attached to the policy.[1] (Docket Entry # 6.) Atkinson has not questioned the authenticity of the attachments, and they are accepted.

There are no genuine issues of material facts, whether viewed from either Atkinson's or St. Paul's perspective, and the case is ripe for summary judgment.[2]

### Facts

Atkinson carried primary insurance coverage against certain marine business risks for losses between $5000 and $1,000,000 with two Lloyd's of London underwriters, Walbrook Insurance Company Ltd. and Anglo–American Insurance Company, Ltd. Walbrook insured fifty-five percent of Atkinson's primary risk, and Anglo–American insured forty-five percent of Atkinson's primary risk. Above this primary coverage, Atkinson purchased excess coverage from St. Paul for losses of $1,000,000 to $5,000,000. Atkinson paid a premium of $300,000 for the primary coverage and $23,500 for the excess coverage. Atkinson incurred certain losses during the policy year in question, and thereafter filed claims with Walbrook and Anglo–American. Walbrook is in receivership and is not paying claims. Specifically, Walbrook is unable to pay Atkinson's claim of about $100,000 for

---

1. At oral argument, St. Paul submitted a substitute schedule to which Atkinson had no objection.

2. The parties consented to having a United States Magistrate Judge conduct any and all proceed-

ings in the case, including the trial and the order of the entry of final judgment, in accordance with the provisions of 28 U.S.C. § 636(c) and Fed.R.Civ.P. 73.

settlements and legal expenses incurred in connection with the claims of two injured crewmen-employees. Atkinson has brought this action against St. Paul seeking a declaration that the excess coverage provided by the St. Paul policy "drops down" to cover the losses that Walbrook can not pay.[3]

The Insuring Agreement between the parties is attached as Exhibit A to defendant's Brief In Support Of Motion For Summary Judgment (Docket Entry # 6.) The pertinent provisions in issue are as follows:

## II. LIMIT OF LIABILITY—UNDERLYING LIMITS

Underwriters hereon shall only be liable for the excess of either—

(a) The amount(s) of the limit(s) set out in underlying insurances identified in the attached Schedule . . ., or

(b) $25,000 Ultimate Net Loss in respect of each occurrence not covered by said underlying insurances (all hereinafter called the "Underlying Limits") and then only up to a further $4,000,000 Ultimate Net Loss in respect of each occurrence.

### Arguments and Analysis

St. Paul contends that under Part II of the Insuring Agreement, quoted immediately above, it limits its liability to one of two categories. It agrees to provide coverage (a) for liabilities in excess of the limits of underlying, i.e., primary, coverages listed in a schedule attached to the defendant's excess policy, or (b) for liabilities in excess of $25,-

000 in respect of an occurrence not covered by the insurances listed in the attached schedule. To illustrate St. Paul's contention,[4] if Atkinson, St. Paul's insured, becomes liable to a person for a tort of slander under a settlement or a jury verdict against Atkinson in the amount of $1,250,000, St. Paul is required to indemnify Atkinson in the amount of $250,000, under II(a) of the Insuring Agreement, *if* Atkinson has primary coverage for that risk (slander) in the amount of $1,000,000 and that coverage is identified in the schedule attached to the excess policy.[5] If, however, in the same illustration, Atkinson has no underlying coverage for the tort of slander, St. Paul must indemnify Atkinson in the amount of $1,225,000, under II(b) of the excess policy.[6] Thus, as Parts II(a) and (b) are written and as the illustrations quantify, the excess coverage will indemnify Atkinson for (a) a loss for which the insured has obtained primary coverage, which is identified in an attached schedule, when the loss is in excess of the limit of the primary coverage, "and then only up to a further $4,000,-000;" or (b) a loss for which the insured has no primary coverage, when the loss is in excess of $25,000, "and then only up to a further $4,000,000."

Atkinson contends that the terms of the excess policy require the excess carrier to afford the coverage an insolvent primary carrier is unable to afford;[7] or, alternatively, that the excess policy is ambiguous and should be interpreted in the light most favorable to the insured after the introduc-

3. Some of these stated facts, taken from St. Paul's brief in support of its motion for summary judgment, go beyond the complaint, and no affidavits or depositions have been filed relative to them; but in neither the memoranda filed by Atkinson nor in oral argument did Atkinson suggest that these recited facts are in error or in dispute. Where the facts go beyond the allegations of the complaint, however, they do not affect the issues raised in any way. After the complaint was filed, the tort action pending in North Carolina and allegedly set for trial on August 2, 1993, evidently was tried or settled. Additionally, a second tort action claim apparently was made to and settled by Atkinson for which Walbrook was unable to respond.

4. This is the Court's illustration, not St. Paul's, but it is faithful to St. Paul's contention. The illustration bears no relation, however, to the actual schedule of underlying insurances attached to the policy in this case.

5. This illustration does not include the expenses of the litigation.

6. Again, expenses of litigation are not included in the illustration.

7. Under this interpretation, St. Paul's liability would begin at the level of the deductible of the primary coverage of the insolvent carrier and continue up to the limit of the insolvent carrier's coverage, and then up to a further $4,000,000.

tion of evidence of the intention of the parties.[8]

■ In *Joseph P. Bornstein, Ltd. v. National Union Fire Insurance*, 828 F.2d 242, 245 (4th Cir.1987), the court stated:

> As we have recognized, the courts of Virginia consistently apply two rules in construing the language of insurance policies. "First, where language in an insurance policy is susceptible of two constructions, it is to be construed liberally in favor of the insured and strictly against the insurer.... Second, where two interpretations equally fair may be made, the one which permits a greater indemnity will prevail." [Citations omitted.] "Where an insurance policy is susceptible of two constructions, one of which would effectuate coverage and the other not, it is the court's duty to adopt that construction which will effectuate coverage." [Citations omitted.]

This lesson of *Bornstein* for this case is that if the excess policy in this case yields two equally fair interpretations, the one which is fairer to Atkinson is to be adopted. That result would eliminate the need for a trial because the interpretation required by law will resolve the controversy and leave no issue for factual determination. Indeed, Atkinson suggests that conclusion by citing *St. Paul Ins. v. Nusbaum and Co.*, 227 Va. 407, 316 S.E.2d 734 (1984), and quoting from it:

> The courts, accordingly, have been consistent in construing the language of such policies, where there is doubt as to their meaning, in favor of that interpretation which grants coverage rather than that which withholds it. Where two constructions are equally possible, that most favorable to the insured will be adopted.

316 S.E.2d at 736.

Atkinson has not offered a single clue to lead the Court to an interpretation of the policy terms that would require St. Paul to "drop down" and "pick up" the insolvent carrier's liability. That is to say, Atkinson has suggested no way for the Court to conclude that the policy is unambiguous and requires a "drop down" interpretation. With regard to ambiguity, Atkinson conceded during oral argument that the provisions of II(a) and (b) of the Insuring Agreement, taken alone, are not ambiguous. Atkinson argues that the provisions become ambiguous when read in conjunction with the meaning of "Ultimate Net Loss," defined in the policy as follows:

### III. ULTIMATE NET LOSS

> The term "Ultimate Net Loss" shall mean the total sum which the Assured becomes obligated to pay by reason of matters set out in Insuring Agreement I, including compromise settlements, and shall include hospital, medical and funeral charges and all sums paid as salaries, wages, compensation, fees, charges and law costs, premiums on attachment or appeal bonds, interest, expenses for doctors, lawyers, nurses and investigators and other persons, and for litigation, settlement adjustment and investigation of claims and suits which are paid as a consequence of any occurrence covered hereunder, excluding, however, the salaries of the Assured's permanent employees and general office overhead and also excluding any part of such expenses for which the Assured is covered by other valid and collectible insurance.

Atkinson's entire argument on this position—that the definition of Ultimate Net Loss makes Parts II(a) and (b) ambiguous—is as follows:

> It is interesting to note that in the St. Paul policy, its definition of "ultimate net loss," does exclude expenses for which the assured is covered "by other valid and collectible insurance." This would certain-

---

**8.** At oral argument the Court asked counsel to state the issues for trial if St. Paul's motion for summary judgment was overruled. Mr. Martin, Atkinson's attorney, stated that in a case concerning an ambiguous contract, the issue would be the original intention of the parties, and it would be decided by a jury after hearing parole evidence.

An insurance contract that supports two equally fair interpretations is, of course, an ambiguous contract. If properly admitted extrinsic evidence renders clear and unambiguous what had been ambiguous, it is the duty of the court to construe the contract in the light of such evidence. On the other hand, if such extrinsic evidence, even though not conflicting, could lead fair-minded persons to different conclusions, then the construction of the contract is for the jury. *Nehi Bottling v. All–American Bottling*, 8 F.3d 157, 161 (4th Cir.1993).

ly give credence to the argument that if insurance is not collectible, then the excess carrier should drop down.

Reply Brief at 4 (Docket Entry # 7.)

If St. Paul is liable under section II(b) of the Insuring Agreement, that liability is to indemnify Atkinson, its insured, for losses in excess of $25,000, up to a maximum loss of $4,025,000. Those losses include judgments, settlement amounts, including payments made to or on behalf of the claimants for their special damages, and the costs of investigation and litigation. Not included, however, are expenses incurred by Atkinson in the form of salaries for its permanent employees and office overhead, which Atkinson may want to apportion as costs of handling the claim and litigation. Also not to be included in those losses are any losses for which Atkinson has valid and collectible insurance. Atkinson asserts that it is this last exclusion, concerning "valid and collectible insurance," that creates an ambiguity in the policy.

It must be kept in mind that St. Paul would be liable to Atkinson under II(b) of the Insuring Agreement only if Atkinson had no underlying insurance *identified in the schedule attached to the policy* for the risk-occurrence that gave rise to the claim against it. If Atkinson had identified underlying coverage, St. Paul's liability would be under II(a).[9] That being so, what is the meaning of the last exclusion—the one excluding losses "for which the Assured is covered by other valid and collectible insurance?" The meaning is that if Atkinson has valid and collectible coverage for a risk that is not included in the

insurances identified in the schedule attached to the policy, St. Paul is not required to indemnify Atkinson for those losses.[10] There is no ambiguity. The meaning of Parts II(a) and (b), standing alone and in connection with the definition of "Ultimate Net Loss," is clear. These provisions are not ones "where two interpretations equally fair may be made." (*Jefferson–Pilot Fire & Casualty Co. v. Boothe, Prichard & Dudley*, 638 F.2d 670, 674 (4th Cir.1980)).

In *Nehi Bottling v. All–American Bottling*, 8 F.3d 157 (4th Cir.1993), the court said:

> The Supreme Court of Virginia has defined ambiguity as "the condition of admitting of two or more meanings, of being understood in more than one way, or of referring to two or more things at the same time." [Citations omitted.] The question of ambiguity, of course, is a legal question to be determined in the first instance by the court. The general rule is that when a written contract is clear and unambiguous, it is the duty of the court, not the jury, to determine its meaning. [Citations omitted.]

8 F.3d at 161.

■ Atkinson has filed the deposition of Oswald S. Ingvaldsen, an insurance broker with forty years of experience, who was employed by the brokerage company placing or renewing the excess policy in issue. Atkinson offered Mr. Ingvaldsen's deposition at the hearing as expert evidence to establish that the policy is ambiguous.[11] Although Mr.

---

**9.** Part II(a) refers to "underlying insurances identified in the attached Schedule...." Part II(b) covers "each occurrence not covered by *said* underlying insurances (all hereinafter called the 'Underlying Limits')...." (Emphasis added.) Therefore, "said underlying insurances" in II(b) refers to those listed in the attached schedule.

**10.** If Atkinson had an insurance contract covering the risk-occurrence involved, but that coverage was not identified on a schedule of underlying insurances, then, as stated, St. Paul would not be required to indemnify Atkinson for that loss. If, however, that unidentified coverage, though valid, was not collectible, because, say, the carrier was insolvent, then St. Paul would owe indemnity under II(b) for the loss in spite of the fact that the coverage was unidentified. This

meaning, however, does not dictate, as Atkinson argues, that therefore, St. Paul would owe coverage under II(b) for the loss under II(a) when the identified underlying coverage is uncollectible. Neither the coverage section (Part I) nor the liability limits section (Part II) of the policy could lead to that interpretation—i.e., lead to such an ambiguity.

**11.** Atkinson does not mention in its Reply Brief its ambiguity argument relative to Mr. Ingvaldsen's testimony. It was during oral argument that Mr. Martin stated that the testimony would support that argument. In any event, it is a question of law for the Court to decide if the contract is ambiguous. *Nehi Bottling v. All–American Bottling, supra.* Fed.R.Evid. 702 permits an expert witness to testify if his testimony

Ingvaldsen's opinion will not be considered by the Court for the purpose of deciding if the contract is ambiguous, or for the purpose of deciding if coverage is provided under II(b) of the Insuring Agreement, it should be noted, for the reason stated below, that the deposition does not meet either purpose for which it is offered.

St. Paul answered interrogatories in this case stating that its excess policy now has a specific provision excluding coverage when the underlying carrier is insolvent.[12] Atkinson argues that this exclusion, added to subsequently issued policies, is evidence that the risk of insolvency was covered in the policy at issue. The Court rejects Atkinson's argument.[13]

Also, Mr. Ingvaldsen testified that during the term of the policy in issue he knows of another carrier, which he believes is Royal Insurance Company, that had typed in on its preprinted excess policy form an exclusion for insolvency of the primary carrier. With this background, Mr. Ingvaldsen was asked and responded as follows:

Q. Do you have an opinion whether this policy, Exhibit 2, would give coverage to Atkinson where its primary underwriter has become insolvent? Keeping in mind that it does not have an insolvency-of-primary-insurer provision in it.

[St. Paul's attorney objected to the question.]

A. My opinion would be, after reading the policy and based on what the Royal Insurance Company has done—it is, of course, that the Royal Insurance Company felt that without that clause they would be subject to a claim of insolvency and that their policy would have to respond subject to what we call SIR, self-insured retention.

The St. Paul policy did not have this clause in it. So as a layman looking at it, I would assume that they have a liability, and they would have to respond subject to the terms, perhaps, or wording of the policy.

■ Atkinson argues in its reply brief that it is Mr. Ingvaldsen's opinion that because insolvency of the primary carrier is not an excluded risk in St. Paul's policy, coverage is afforded by Part II(b) of the Insuring Agreement. It is clear, however, that Mr. Ingvaldsen based his opinion only upon knowledge that Royal Insurance Company added a similar exclusion to one of its policies by typing it in on its preprinted policy form. Mr. Ingvaldsen then concluded that because St. Paul did not have the same exclusion, "I would assume that they have a liability." Even then, he added: "subject to the terms, perhaps, or wording of the policy." If expert evidence is admissible to prove that the St. Paul policy provides "drop down" coverage, the Court finds that Mr. Ingvaldsen's testimony fails to rise to the level of an expert opinion.

■ Atkinson claims in ¶ 9 of the complaint that under the terms of the policy and the facts alleged—the claims made against it and the insolvency of the primary carrier— St. Paul should "drop down" and assume the liability of the insolvent carrier, i.e., that St. Paul should become the primary carrier with respect to Walbrook's share. In ¶ 10, Atkinson claims that the policy is ambiguous, and that under familiar rules of construction, it should be interpreted in its favor. For the reasons stated, the Court FINDS that under the excess policy, St. Paul is not liable for the coverage that Walbrook is now unable to

will help the fact finder "understand the evidence or ... determine a fact in issue." In deciding the issue raised in St. Paul's motion, the Court is not determining a factual issue nor attempting to understand the evidence.

12. The interrogatory and the answer were not offered, but St. Paul did not deny the assertion. The provision is as follows:
"XII. INSOLVENCY OF PRIMARY CARRIER
In the event there is no recovery available to the Assured as a result of the bankruptcy or insolvency of any of the Underlying Insurers

... the coverage hereunder shall apply in excess of the applicable limit of liability specified in the Schedule of Underlying Insurances." (Plaintiff's Reply Brief, Exh. A. (Docket Entry # 7.) The exhibit was not verified, but St. Paul did not object to it.)

13. Manifestly, if such an argument were accepted every insurance company adding a new provision to a standard policy would risk having the new provision used against it in litigation interpreting previously issued policies.

provide because of its insolvency. The Court FURTHER FINDS that the policy is clear and unambiguous.

St. Paul cites a number of cases which support its position that the majority of courts considering this problem hold that the excess carrier is not obligated to "drop down" when the primary carrier is insolvent. Of those cases cited by St. Paul in its Brief In Support Of Motion For Summary Judgment, Atkinson advances various reasons for distinguishing them. Atkinson's efforts to distinguish these cases demonstrate, however, that no "drop down" law, as such, exists; either the excess coverage does or does not "drop down" when the primary carrier is insolvent. Each case cited rests its decision on an interpretation of the terms contained within the particular policy at issue. It appears that the majority of courts hold that the excess carrier is not required to "drop down" because nothing in the particular policy at issue requires it. Therefore, the Court's decision in this case is not based upon those holdings of other courts faced with similar problems, but is based upon an interpretation of St. Paul's policy which the Court finds is unambiguous.[14]

### ORDER

It is ORDERED that defendant's motion for summary judgment is GRANTED for the reasons stated in the foregoing opinion.

14. To this is added the comment of the court in *Fried v. North River Ins. Co.,* 710 F.2d 1022 (4th Cir.1983):

Beyond the language of the contested phrase, we are convinced that the intent of the parties was to achieve excess liability coverage above the threshold level of the face value of the Schedule A policies. The whole concept of these umbrella policies is to provide inexpensive coverage for unusual catastrophic losses above the limits of conventional primary coverage maintained by the average individual. At 1026.