46 F.3d 1124
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
HOTEL ASSOCIATES OF PALM SPRINGS, a California Limited
Partnership, Plaintiff-Appellee,
v.
LANDMARK LAND COMPANY OF CALIFORNIA, INCORPORATED, a
Delaware Corporation, and Does 1 through 25,
inclusive, Defendant-Appellant.
 No. 94-1765.
 United States Court of Appeals, Fourth Circuit.
 Argued Oct. 31, 1994.
Decided Feb. 1, 1995.
 
 ARGUED: Joseph Anthony Guzinski, Division of Legal Services, Complex Litigation Section, RESOLUTION TRUST CORPORA TION, Washington, DC, for Appellant. John Brady Hagerty, NELSON, MULLINS, RILEY & SCARBOROUGH, Columbia, SC, for Appellee. ON BRIEF: Robert G. Currin, Jr., Melissa Ann Jones, ADAMS, QUACKENBUSH, HERRING & STUART, P.A., Columbia, SC, for Appellant. N. Keith Emge, Jr., NELSON, MULLINS, RILEY & SCARBOROUGH, Charleston, SC, for Appellee.
 Before ERVIN, Chief Judge, HAMILTON, Circuit Judge, and MACKENZIE, Senior United States District Judge for the Eastern District of Virginia, sitting by designation.
 OPINION
 ERVIN, Chief Judge:
 
 
 1
 The sole issue in this case is whether the owner of the La Quinta Hotel ("Hotel"), Hotel Associates of Palm Springs ("HAPS"), or the manager of the Hotel, Landmark Land Company ("Landmark"), has the right to control $3.7 million in the Hotel Account. The Hotel Account is the bank account into which working capital and all funds generated by Hotel operations are deposited. Both parties claim these funds under the terms of the Settlement Agreement executed in June 1993. For the reasons stated below, we reverse the district court's determination that HAPS is entitled to control the account.
 
 I.
 
 2
 HAPS purchased the Hotel in November 1984. In February 1988, Landmark's parent company, Oak Tree Savings Bank and its affiliates, made a Construction Loan to HAPS for the purpose of refinancing the Hotel, financing HAPS' acquisition and development of an additional tract, and financing the Hotel's continued development. A Management Agreement was also executed giving Landmark the sole and exclusive authority to manage the Hotel. Subsequent loan agreements from Landmark affiliates to HAPS and its related entities were executed in December 1988 and January 1989.
 
 
 3
 In 1991, Landmark filed for bankruptcy relief under 11 U.S.C. Sec. 1101 in the South Carolina District Court. Landmark is currently a Chapter 11 reorganized debtor, operating under its confirmed Plan of Reorganization. Its parent companies, Clock Tower Investment, Ltd. and Oak Tree Savings Bank, were taken over by the Resolution Trust Corporation, as conservator.
 
 
 4
 In April 1993, as a result of certain disputes arising under the loan agreements and the Management Agreement, the district court, by a Consent Order, authorized HAPS and Landmark to take any action necessary to effectuate a settlement agreement. Two months later the parties entered into such an agreement. As part of the Settlement Agreement, HAPS gave a Secured Promissory Note (Revolver Loan) in favor of Landmark for approximately $37 million and an Amended and Restated Secured Promissory Note ("Construction Loan") in favor of Oak Tree Investment Company (OTI), a Landmark affiliate, for approximately $98 million. The Settlement Agreement, then, brought current and restructured all of the outstanding Hotel debt, including all accounts payable to Landmark affiliates. Additionally, an Affirmation and Amendment to the Management Agreement was executed.
 
 
 5
 During settlement negotiations, HAPS and Landmark maintained their management relationship, and Landmark continued its control over the Hotel Account. After the closing of the newly restructured deal, HAPS received a memo from Landmark demanding funds to pay down the Revolver Loan, even though no payment was due under the terms of the loan until January 1, 1997. HAPS, then, requested the cash in the Hotel Account prior to the closing, which consisted of $3.7 million. Landmark eventually conceded it had no authority to apply the money to the repayment of the Revolver Loan. Landmark asks that it be allowed to continue its exclusive control over the Hotel Account, pursuant to the Management Agreement, as affirmed and ratified by the Affirmation of Management Agreement.
 
 
 6
 In December 1993, HAPS brought suit against Landmark seeking control of the $3.7 million. After a two-day trial in May 1994, the district court concluded that the Settlement Agreement "contemplates a complete cleaning of the slate as to the rights and obligations of the parties to one another." As support for this conclusion, the court noted that all past due amounts had been paid, new obligations had been undertaken, and releases of all claims relating to prior documents had been executed.
 
 
 7
 The court was particularly disturbed by Landmark's motives and its original attempt to pay down the Revolver Loan, stating: "It is transparent that [Landmark] is merely searching for a hole through which it can pull the money from HAPS' pocket and place it in its own." Thus, the district court ordered that HAPS is entitled to control the $3.7 million.
 
 II.
 
 8
 Contract interpretation is a question of law; and, therefore, we review de novo the district court's findings. Nehi Bottling Co., Inc. v. All-American Bottling Corp., 8 F.3d 157, 162 (4th Cir.1993). The issue here is not who owns the money, but rather, who is entitled to control the money. Deciding this issue requires our interpretation of three documents: the Settlement Agreement, the Management Agreement and Addendum ("Management Agreement") and the Affirmation and Amendment to the Management Agreement ("Affirmation Agreement"). Choice of law provisions in these documents require that we apply California substantive law. Under California law, separate written documents relating to the same subject matter are to be construed together as one transaction. Varco-Pruden, Inc. v. Hampshire Constr. Co., 50 Cal.App.3d 654, 660, 123 Cal.Rptr. 606, 610 n. 2 (1975).
 
 
 9
 Both parties agree that HAPS owns the money in the Hotel Account. This account, though owned by HAPS, was created pursuant to the Management Agreement that gave Landmark exclusive control of the funds under sections 5.2 and 5.4. In particular, section 5.2 states: "Subject to the terms of this Agreement, Manager shall have full control and discretion in the operation of the Hotel. The control and discretion of Manager shall extend to all aspects of Hotel operation in accordance with the Annual Budget, including, without limitation, ... (vii) the maintenance of the bank accounts and holding of funds."
 
 
 10
 The Management Agreement was incorporated into the Affirmation Agreement, which was executed as part of the Settlement Agree ment. Under section 1.2. of the Affirmation Agreement, the parties agreed to "affirm and ratify the Management Agreement and the Addendum as the same shall be amended in accordance with the terms and conditions set forth below." Additionally, section 3 of the Affirmation Agreement states: "Subject to the terms and conditions as set forth below, the parties affirm and ratify their respective obligations under the Management Agreement and the Addendum, and the Management Agreement and the Addendum remain unmodified and in full force and effect, as the same are being amended in accord with this Affirmation...."
 
 
 11
 The Affirmation Agreement, incorporating the Management Agreement, was incorporated into the Settlement Agreement. Section 12.2 of the Settlement Agreement, which is entitled "Entire Agreement," states in part that:
 
 
 12
 [t]his Agreement, the Construction Loan Modification Document, ... the Affirmation of Management Agreement, ... the Revolver Loan Documents and all other documents or instruments executed, or to be executed, pursuant to any of the foregoing, contain the sole and entire agreement and understanding of the parties with respect to the entire subject matter hereof and thereof....
 
 
 13
 Additionally, the execution and delivery of the Affirmation Agreement was a condition precedent to the closing under sections 5.1.2.1.4 and 5.2.2.1.4 of the Settlement Agreement.
 
 
 14
 Thus, the Management Agreement was part of the Affirmation Agreement, and the Affirmation Agreement was part of the Settlement Agreement. Under section 8.8 of the Management Agreement, money was to be paid out of the Hotel Account in the following order of priority: (a) operating expenses, (b) working capital, (c) fixed expenses, (d) debt service, (e) cash flow shortfall loan interest, and (f) cash flow shortfall loan principal. The Affirmation Agreement deleted this section and substituted the following priorities: (a) adjusted expenses, (b) working capital, (c) FF & E (furniture, fixtures, and equipment) Reserve, (d) debt service on the Construction Loan, (e) owner advances, and (f) the Revolver Loan. Additionally, section 8.8. (k) of the Management Agreement, providing for the equal distri bution of any remaining cash flow after the priority payments specified in sub-sections a-j, was deleted.
 
 
 15
 As Landmark correctly argues, under the deleted section 8.8(k) of the Management Agreement, HAPS was not entitled to receive any funds from the Hotel Account until after the priority payments in 8.8(a-j) were fulfilled. Even then, remaining cash flow had to be distributed equally between HAPS and Landmark. Even section 8.8(h), entitled "Cash Flow Before Deferred Fees" and providing for an equal distribution between owner and manager not to exceed a collective sum of $3.2 million, includes specific conditions: an agreement between the manager and owner as to the value of the hotel, a requirement that the cash flow not result from any sales or refinancing event, and a requirement that priorities (a-g) have been fulfilled. These conditions have not been met in this case.
 
 
 16
 HAPS argues that the Settlement Agreement and Affirmation Agreement created new obligations. It argues that the changing priorities in the Affirmation Agreement reflect the intent of the parties to begin new relationships. A close examination of these documents, however, indicates that the Affirmation Agreement was similar to the Management Agreement and substantially incorporated its terms. Most important, the Affirmation Agreement does not modify Landmark's control over the Hotel Account pursuant to the Management Agreement. Furthermore, a new Hotel Account was not created, and the same account was used. Thus, rather than creating a new relationship, these documents maintained an existing, though slightly modified, contractual relationship.
 
 
 17
 Nevertheless, HAPS argues that Landmark released its claim to these funds under section 6.1 of the Settlement Agreement. Landmark, on the other hand, contends that under section 6.1.2, the exception to the release provision, it did not release any claims under the Management Agreement or the Affirmation Agreement. Section 6.1.1 entitled "[Landmark] Release," states:
 
 
 18
 Except as limited and qualified by Section 6.1.2 of this Agreement, [Landmark] does hereby release and forever discharge [HAPS] from "any and all claims, debts, damages, liabilities, actions ... arising prior to the La Quinta PGA Closing Date from or relating to the Construction Loan, the Construction Management Agreement, the Expansion Loan, the Second Lakeville Loan or the Management Agreement or any act, omission, circumstance, fact, event or transaction relating to any of them prior to the La Quinta/PGA Closing Date.
 
 
 19
 (Emphasis added).
 
 
 20
 Section 6.1.2, entitled "Exceptions to [Landmark's] Releases," states:
 
 
 21
 [Landmark] specifically [does] not release any and all claims, debts, damages, liabilities, charges, suits, demands, obligations, costs, expenses, disputes, actions and causes of actions of anyone or all may have against [HAPS] either (a) arising after the La Quinta/PGA Closing Date or (b) created by, arising out of or continuing under this Agreement, the Construction Loan Modification Documents, the Construction Deed of Trust, the Expansion Tract Deed of Trust, the La Quinta Conveyance Agreement, the Affirmation of Management Agreement, the PGA Conveyance Agreement, the Revolver Loan Documents and any and all documents or instruments executed ... all of which claims, debts, damages, liabilities, charges, suits, demands, obligations, costs, expenses, disputes, actions and causes of actions of every nature relating thereto are expressly not released and are reserved by [Landmark].
 
 
 22
 (Emphasis added).
 
 
 23
 Careful reading of section 6.1.2 indicates that claims and causes of actions "created by, arising out of or continuing under" the Settlement Agreement and the Affirmation of Management Agreement were reserved, and not released. Since the Affirmation Agreement incorporates the Management Agreement, claims under the Management Agreement were also preserved. There is an identical release provision with respect to HAPS' rights under section 6.1.4. Thus, neither party released any claims or rights under the Settlement Agreement, the Affirmation Agreement, or the Management Agreement. Contrary to HAPS' argument that the Settlement Agreement released only future obligations of the parties, the reference to, and incorporation of, the Management Agreement and the Affirmation Agreement into the Settlement Agreement indicates that prior claims were not waived. Landmark's claim to the $3.7 million in the Hotel Account was preserved in the Settlement Agreement.
 
 
 24
 The district court erroneously allowed Landmark's initial motive--to use the funds to pay down the Revolver Loan on which payments were not due until 1997--to affect its interpretation of the contract. Moreover, section 9.2.2 of the Affirmation Agreement allows for an optional prepayment of the revolver note by the owner, in accordance with specific priorities. Thus, Landmark's request for funds for the Revolver Loan was not without a contractual basis. Additionally, under section 2.32 of the Affirmation Agreement, the definition of working capital under the Management Agreement was deleted and replaced by a new definition: "the amount of working capital for the Hotel from time to time determined by Manager in its sole discretion to be necessary for the operation of the Hotel, subject to the approval of [Landmark affiliate]." The discretion given to Landmark to determine the amount of working capital supports its argument for allowing the funds to remain in the Hotel Account. Additionally, the manner in which the purchase of the Hotel was financed clearly indicates that Landmark has an interest in closely monitoring the management of the Hotel.
 
 
 25
 The district court erroneously focused on ownership, rather than control, stating that "the parties do not dispute that HAPS owns the money in question or that the money was HAPS prior to the date of the settlement. Nowhere in the settlement documents does Debtor [Landmark] retain a claim against funds owned by HAPS prior to the Settlement Agreement." The explicit terms of the documents, however, clearly indicate that Landmark never relinquished its control over the money and that its claim is preserved under 6.1.2 of the Settlement Agreement.
 
 
 26
 In conclusion, the exception to the release provision specifically excluded claims, debts, and causes of action arising under the Settlement Agreement, the Management Agreement, and the Affirmation Agreement. There is no contractual provision for the distribution of any money to HAPS other than section 8.8 of the Affirmation Agreement. The necessary conditions under that provision, however, have not been met. For these reasons, we find that the $3.7 million, although owned by HAPS, is subject to Landmark's control. Landmark, then, is entitled to retain control over those funds, pursuant to the terms and conditions of the Management Agreement, as affirmed, ratified, and modified by the Affirmation of Management Agreement. We, therefore, reverse and remand this case to the district court with instructions to enter a judgment declaring that Landmark is entitled to retain control of the $3.7 million in question, subject to the terms and conditions of the agreements between the parties.
 
 
 27
 REVERSED AND REMANDED.